# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CLEAR CHANNEL BROADCASTING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. FILED: MAY 19, 2008 |
| THE TRIBUNE COMPANY, LOCAL TV LLC, and ANDREW FRIEDMAN, | ) ) ) | 08 cv 2884    JH JUDGE GOTTSCHALL MAGISTRATE JUDGE COX |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Clear Channel Broadcasting, Inc. ("Clear Channel") states as follows for its complaint against Andrew Friedman ("Friedman"), Local TV LLC ("Local TV"), and The Tribune Company (defendants Local TV and the Tribune are herein referred to as the "Tribune" and Friedman, Local TV, and the Tribune all are hereinafter collectively referred to as "Defendants"):

### INTRODUCTION

1.     This action is brought to address defendant Friedman's breaches of his employment agreement with Clear Channel, his breaches of fiduciary duty, and his threatened disclosure of Clear Channel trade secrets. Clear Channel also seeks relief against the Tribune for its tortious interference with Clear Channel's contract with defendant Friedman, its inducement of his breaches of fiduciary duty, and its actual and threatened misappropriation of Clear Channel's trade secrets.

2.     Against defendant Tribune, Clear Channel seeks the full array of relief, including damages and injunctive relief of a temporary, preliminary, and permanent nature. However, Clear Channel seeks herein against defendant Friedman only temporary and preliminary injunctive relief in aid of, and pending, arbitration. Friedman's employment agreement contains an arbitration clause, and Clear Channel is initiating an arbitration proceeding with the American Arbitration Association ("AAA"). However, because Defendants' conduct would irreparably harm Clear Channel during the time that it will take to initiate an AAA proceeding, to choose an arbitrator and to obtain a hearing before that arbitrator, Clear Channel seeks temporary and preliminary injunctive relief to preserve the last undisputed status quo pending arbitration and to protect it from such harm. Such relief is vital given that Clear Channel is advised that Friedman has already commenced employment with the Tribune.

## FACTS

**The Parties and Jurisdiction**

3.     Clear Channel is a Nevada corporation with its principal place of business in San Antonio, Texas. As described in more detail below, Clear Channel is engaged in the business of creating and distributing content for various types of media, including radio, the internet, cell phone, and television.

4.     Defendant Friedman was employed by Clear Channel as a key executive in its Online/Interactive Business, as described below, and he has recently left Clear Channel to work for defendant Tribune. Defendant Friedman is a citizen of Illinois.

5.     Defendant Tribune is a Delaware corporation with its principal place of business in Chicago, Illinois. Through various subsidiaries, the Tribune owns and controls a number of

media ventures, including newspaper, radio, and television.   The Tribune is one of Clear Channel's direct competitors in the Online/Interactive Business.

6.     Local TV is a Delaware corporation with its headquarters in Fort Wright, Kentucky, doing business with defendant Tribune in Chicago, Illinois.

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (a).  The action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

8.     This Court also has federal question jurisdiction over Count I pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1030 and supplemental jurisdiction over all other counts pursuant to 28 U.S.C. § 1367.

**Clear Channel's Online/Interactive Business**

9.     American audiences increasingly get their news, entertainment, and other information from the internet, and one of Clear Channel's most important strategic and operational initiatives in the last several years has been to assemble a team of executives to focus on the distribution and monetization of content through media other than terrestrial (e.g., television and traditional radio) broadcasting.  Clear Channel has created and devoted an entire business unit to this effort, which is known as Clear Channel Online Music & Radio ("CCOMR").  CCOMR conceives, creates, and distributes all types of content (for example news, sports, lifestyle content, weather, traffic, and music, in both audio and visual formats) through non-terrestrial media, such as the internet and wireless networks, to devices other than radios and televisions, such as computers, cell phones, and other handheld electronic devices. This type of distribution is sometimes referred to as "Internet Protocol (IP)" transmission.  One way to distribute content via internet protocol is through a website, and CCOMR has a network

of such sites offering "on demand" news, entertainment and music content, as well as interactive programming features such as news podcasts, weather, and traffic.  One example of such a CCOMR website is www.kfi640.com.  CCOMR refers to its new business as the "online business" or the "interactive business," and these terms are generally used interchangeably in the marketplace, as well.  CCOMR's business in this area is referred to herein as its "Online/Interactive Business."

10.    The market for online distribution of this type of content is growing significantly and thus becoming increasingly competitive, as is competition for advertising clients, with market participants constantly attempting to develop new and different programming and interactive features, improve marketing efforts, maintain and expand market penetration, gain a pricing and cost advantage, and increase sales.

11.    The Tribune and Clear Channel are direct competitors in the Online/Interactive Business, as the Tribune also distributes audio, video, and/or data content, in analog, digital, cellular, broadband, streaming, and/or "high definition" form to be received via radio, television, cable, internet, satellite, wireless or otherwise.  Said content is receivable in any of the geographic areas in which Friedman had responsibilities and duties for Clear Channel.

12.    On information and belief, Local TV and the Tribune have formed an entity or joint venture with which, and/or through which, the Tribune is engaging in the Online/Interactive Business in competition with Clear Channel.  (See media statement attached hereto as Exhibit G.)  Friedman has repeatedly stated and announced that he is going to work for the Tribune. Most recently, he announced that he has accepted employment with the Tribune as its Vice President - Interactive, Tribune.  The email address that Friedman is using for his Tribune employment is @localtvllc.com, indicating that he is also working for Local TV.  Consequently,

the Tribune and Local TV are both collectively referred to herein as the "Tribune." Friedman has informed Clear Channel that his new duties for the Tribune will be a mixture of his former positions for Clear Channel.

**Defendant Friedman's Access To Confidential Information**

13.     Friedman was part of a small group of key executives responsible for building Clear Channel's Online/Interactive Business. Friedman was the most senior executive located in Chicago working for CCOMR, the division specifically devoted to Clear Channel's Online/Interactive Business. Since June of 2007, Friedman has been CCOMR's Vice President of Marketing for News/Talk and Sports. In that position, Friedman was responsible for working with Clear Channel's non-music related radio stations across the country to grow their audience and revenue by developing their websites, site content, and programming, and interfacing between those stations and CCOMR with respect to strategic and business planning issues relating to the Online/Interactive Business. Prior to June of 2007, Friedman was CCOMR's Vice President of News Content, in which position he was charged with conceiving and developing news-related content and programming for the Online/Interactive Business' websites.

14.     Due to his positions as a key executive in Clear Channel's Online/Interactive Business, Friedman was deeply involved in the formulation and implementation of the confidential plans and strategies that Clear Channel uses to develop, market, implement, and distribute its online offerings, and Friedman had access to, and participated in the development of, a wealth of other non-public, confidential, and highly valuable information regarding Clear Channel's Online/Interactive Business. The Confidential Information to which Friedman was provided access by virtue of his position at Clear Channel includes:

a) Which new content, programming, and features Clear Channel currently had (and did not have) in its development pipeline, and which new and "next generation" content, programming, and features Clear Channel had identified and was planning for the future, including Clear Channel's planned market positioning for that content, programming, and features.

b) Information regarding Clear Channel's introduction of new content, programming, and features, including the timing and schedules for the expected launch and/or offer and associated positioning proposals for advertising clients.

c) Cost, pricing, performance, and profit information regarding Clear Channel's programming, content, and features. For example, Defendants know Clear Channel's on-line costs, Clear Channel's on-line pricing methods and strategies, and CCOMR's profit margins for all of CCOMR's offerings.

d) Information regarding particular markets, audience, and on-line performance that Clear Channel has developed over time and after the investment of great expense and effort.

e) Client information, including the needs and preferences of particular clients, contract terms, sales volume, and pricing for clients, as well as comparative or relative client information, such comparative volume, pricing, and profitability information, and which clients have the most advantageous payment and credit record.

f)  The terms and details of the contracts and business arrangements that Clear Channel has with its vendors and suppliers (e.g., wire services, photo providers, and other content providers);

g)  Other non-public personnel information, such as the identity and compensation range of the most valued performers and those who would be most useful to a media company attempting to start or strengthen an Online/Interactive Business;

h)  Financial data, such as sales and profits forecasts, costs, and profitability data, spending priorities, and revenue goals;

i)  Information regarding the comparative profitability and other performance data for the various types of online initiatives;

j)  CCOMR's unique system for project management and its particular processes to devise, test, and implement new initiatives;

k)  Knowledge of internal comparative benchmark performance data beyond those measured by third parties; and

l)  Information of the foregoing types relating to the various Clear Channel radio stations with whom Friedman dealt.

15.    The information listed above, (the "Confidential Information") is of particular competitive significance and value due to the fact that it is sufficiently secret not to be generally known to Clear Channel's competitors, who would greatly benefit from access to this information. Clear Channel's use of this Confidential Information has been key to its success and its recognition as a leader in the Online/Interactive Business. CCOMR has been publicly recognized for its thought leadership and innovation position in the online space.

16.    Clear Channel has taken reasonable measures to protect the secrecy of the Confidential Information, including but not limited to the following:

    a)  Clear Channel's facilities are secured with locks and an electronic keypad and alarm system;

    b)  the reception area is staffed by a receptionist who monitors and logs all visitors;

    c)  Clear Channel's facilities are locked before and after business hours;

    d)  no visitors are allowed beyond the reception area unless authorized by an Clear Channel employee;

    e)  Clear Channel's electronically stored Confidential Information is passcode protected;

    f)  employees have access to both paper and electronic documents on a "need to know" basis;

    g)  Clear Channel uses shredders to dispose of sensitive documents;

    h)  Clear Channel's key employees are required to acknowledge their notification of, and agreement to, certain terms of employment, including their agreement with Clear Channel's strict non-disclosure requirements, for example, as embodied in the form Employment Agreement attached hereto as Exhibit A and the Employee Guide attached hereto as Exhibits B;

    i)  Clear Channel's key employees are required to acknowledge their notification of, and agreement to, Clear Channel's Code of Business Ethics and Conduct attached hereto as Exhibit C, which requires strict compliance with measures to protect Confidential Information; and

j)   Clear Channel holds exit interviews of its departing employees in which Clear Channel confirms the return of all company records and other property.

17.    Like Clear Channel's other employees, Friedman was informed and expressly agreed that he would receive in the course of his duties confidential information belonging to Clear Channel, and he was instructed and agreed to keep that information confidential.  For example, Friedman was provided with a copy of Clear Channel's Employee Guide, which describes examples of the Confidential Information to which employees will be exposed at Clear Channel and requires employees to protect the confidentiality of that information.   The Employee Guide also contains policies instructing employees regarding the proper use of Clear Channel's computers and computer system and the protection of information stored therein, and policies instructing employees regarding treatment of Clear Channel's electronically stored information and the proper use of the internet and email system.  (See Exh. B, at pp. 11-13, 16-17, 18-19)

18.    Friedman also received Clear Channel's Code of Conduct and agreed to abide by its terms, which includes policies and provisions for safeguarding company assets in including Confidential Information.  (See Exh. C, at pp. 13-14)

19.    Friedman executed acknowledgements that he had received and read the Employee Guide and Code of Conduct and would comply with them.  A copy of his signed acknowledgements are attached hereto as Exhibit D.

**Defendant Friedman's Employment Agreement**

20.    To further protect Clear Channel's Confidential Information, and to enable Clear Channel to share that information with Friedman, Friedman also entered into an Employment

Agreement with Clear Channel, a copy of which is attached hereto as Exhibit A (the "Employment Agreement"), which expressly provides, in pertinent part:

    a) That Friedman will remain employed by Clear Channel until December 31, 2008. Specifically, Section 1 of the Employment Agreement provides for an initial term through December 31, 2007, and states that the Employment Agreement will automatically renew for an additional one-year term unless either Friedman or Clear Channel gives written notice of non-renewal by October 1, 2007. Neither Friedman nor Clear Channel provided notice of non-renewal, and so the term of the Employment Agreement was extended through December 31, 2008. (See Exh. A, §1)

    b) That Friedman shall not render any services to any other person or business during his employment with Clear Channel. (See Exh. A, §2(b))

    c) That Friedman shall not use or disclose Clear Channel's confidential information without authorization. (See Exh. A, §4)

    d) That Friedman shall not, for a period of sixty (60) days after employment ends, solicit any of Clear Channel's radio clients in any market in which Employee has conducted business for the Company. (See Exh. A, §6)

    e) That Friedman shall not, during his Clear Channel employment and for a period of sixty (60) days thereafter, "directly or indirectly, be employed or retained by, own, manage, control, or be connected with, in any capacity whatsoever, whether as an officer, director, shareholder, partner, associate, employee, owner, consultant, provider of professional services or otherwise to any business that distributes audio, video and/or data content, whether such

distribution is in the form of analog, digital, cellular, broadband, streaming, "high definition" or otherwise, and whether such distribution is received via radio, television, cable, internet, satellite, wireless or otherwise which is receivable in any counties located in any Designated Market Area (the "DMA") in which Employee has responsibilities and duties under this Agreement or within a 50-mile radius of such DMA as defined by Arbitron." (See Exh. A, §7(a))  (Arbitron provides statistical data regarding the radio industry, much in the same way that AC Nielsen does for television.)

21.　　As an executive, and given both the nature of the relevant marketplace and the nature of his duties to work with Clear Channel radio stations throughout the country, Friedman's responsibilities and duties for Clear Channel related to the entire United States.

**Friedman's Breaches of Contract and Fiduciary Duty**

22.　　The Tribune has not achieved the same degree of success in the Online/Interactive Business as has Clear Channel.

23.　　Sometime prior hereto, the Tribune decided that it could achieve greater success in the Online/Interactive Business by hiring Friedman – one of the key executives responsible for the success of Clear Channel's Online/Interactive Business – despite his contractual obligations to Clear Channel prohibiting his employment by the Tribune and prohibiting his use or disclosure of Clear Channel's Confidential Information.

24.　　Beginning no later than March 2008, the Tribune solicited Friedman and induced him to resign from Clear Channel.  (See 3/21/08 email from Gabe Hobbs to Friedman, 1/10/08 and 4/3/08 chain of emails between Friedman and Gloria Hinrichs, all attached hereto as Exhibit

E.)  Tribune's efforts were successful, resulting in his resignation.  His last day was Monday, May 12, 2008.

25.    Well before his Clear Channel employment ended on May 12, 2008, however, Friedman began providing professional services, including strategic advice, to the Tribune, participating in Tribune's business meetings and the making of business decisions, and soliciting his former colleagues to leave Clear Channel and join Tribune.  As just one example, no later than May 5, 2008, Friedman provided information to Russ Gilbert, an employee and agent of the Tribune, regarding content strategy, vendor recommendations, and certain vendors' pricing to Clear Channel.    (See 2-14-08 email chain including messages regarding expansion of the Tribune's business and 5/5/08 email exchange, both attached hereto as part of Exhibit E.)  Friedman also provided Tribune assistance with recruiting and is soliciting his former Clear Channel colleagues to join Tribune.  (See 5/8/08 email and 5/2/08 email also attached as part of Exhibit E.)  Indeed, Tribune set Friedman up with a "localtvllc.com" email address in order to better provide this assistance (id.), but Friedman cautioned his Tribune colleagues to keep their conversations "confidential" because "that will allow us to delve into lots of areas that are delicate, but useful and critical."  (See 5/9/08 email included in Exhibit E.)

26.    Additionally, while Friedman was still employed by Clear Channel, he emailed other Clear Channel Confidential Information to the Tribune.  Specifically, on April 4, 2008, Friedman sent an email from his personal "hotmail" email account to himself at his Tribune-arranged localtvllc.com email account.  That email contained no text but had as an attachment a file named "Andy's Contacts" – presumably transmitting the file from his Clear Channel computer bearing the same name and containing a compilation of important contacts generated

and used by Clear Channel in its Online/Interactive Business.  (See 5/4/08 email attached hereto as Exhibit F.)

27.    The Tribune solicited, recruited, and hired Friedman, and induced him to provide it with services, assistance, and Clear Channel Confidential Information while he was still employed by Clear Channel, with full knowledge that Friedman was a Clear Channel executive, with full knowledge of his Employment Agreement, in spite of that agreement, and with the intent and knowledge that Friedman was breaching that agreement and his fiduciary duties to Clear Channel.  Tribune intentionally interfered with Friedman's contract and with his fiduciary duties, inducing those breaches without privilege or justification.

28.    Defendants' conduct described above was willful, malicious, and done in bad faith and with the intent and purpose of causing a breach of Friedman's contractual and fiduciary obligations, exploiting Friedman's position of trust and confidence, and misappropriating Clear Channel's Confidential Information, for the benefit of Defendants and to the great detriment of Clear Channel.

**Friedman Will Receive His Full Salary**
**for the Duration of the Non-Compete Until December 31, 2008**

29.    Friedman is obligated under the Employment Agreement's non-compete provision until December 31, 2008.  Specifically, when Friedman resigned from Clear Channel, he elected to do so pursuant to Section 8(d) of his Employment Agreement.  The Employment Agreement provides that, in the event of a termination under Section 8(d): "...[I]f the Employee signs a general release of claims in a form and manner satisfactory to the Company, the Company will, within 45 days, pay to the Employee...the greater of (1) the amount equal to Employee's salary for four months; or (2) the amount equal to Employee's salary for the entire duration of the Employment Period as defined in Section 1 (the "Severance Payments").

Notwithstanding the 60-day period of time noted in Section 7, the non-competition agreement in Section 7 shall apply during the entire period of severance payout." (Exh. A, § 9(d)) The Employment Period specified in Section 1, and the severance payout, extends through December 31, 2008. (Exh. A, § 1)

30.     Clear Channel has complied with all of its obligations under the Employment Agreement, and will continue to comply with those obligations, including payment of severance to Friedman until December 31, 2008 while he is foregoing competition.

**Actual Misappropriation and**
**The Inevitability of Future Misappropriation and Harm**

31.     Friedman has misappropriated Clear Channel Confidential Information in the days preceding his resignation, for example by emailing it to the Tribune, for example as described above.

32.     The investigation of Friedman's conduct and treatment of Clear Channel's Confidential Information is still continuing. Friedman's last day of work for Clear Channel was May 12, 2008. He was asked to return his computer prior to leaving but did not. Counsel for Clear Channel sent a written request to Friedman's attorney on the afternoon of May 12, 2008 asking for return of the computer. Friedman turned his computer over to Clear Channel counsel the next day, May 13, 2008. While analysis of that computer is still ongoing, Clear Channel has learned that on the morning of May 13, 2008, Friedman deleted thousands of files from his computer, including software and user files, and including files relating to his work for Clear Channel and files relating to his work for the Tribune.

33.     Clear Channel has also learned that the only active Outlook "pst" files on Friedman's computer are completely empty of emails. Some emails do continue to reside in certain folders, and more may be recoverable via forensics tools, but the indication at present is

that Friedman's computer is missing emails where one would expect to find them. Significantly, the forensics evidence shows that Friedman connected several portable hard drives to his Clear Channel computer in the weeks and days prior to leaving Clear Channel. Friedman has not turned in to Clear Channel any portable hard drives used in connection with his Clear Channel computer. Among the emails still residing on the computer are many referring to Friedman's work for the Tribune while still a Clear Channel employee.

34.    None of this computer-related conduct was authorized by Clear Channel and appears to have resulted in the loss of information and data belonging to Clear Channel as well as the loss of significant information regarding Friedman's activities in the last several weeks of his employment by Clear Channel, including his work for Tribune. The Tribune encouraged and induced Friedman's conduct and is reaping the benefits of that conduct, in the form of Clear Channel's Confidential Information.

35.    In light of the important Confidential Information possessed by Friedman, and in light of his demonstrated disregard for the integrity and rightful ownership of that information, it is clear that continued and future misappropriation of Clear Channel's Confidential Information is both threatened and inevitable. Friedman's duties for the Tribune will involve developing, marketing, and programming the very same and similar types of content and information that he marketed and advised on for Clear Channel. His job duties for the Tribune appear to involve the similar strategic responsibilities that he fulfilled in his job for Clear Channel, since the two companies compete directly in the Online/Interactive Business and since Friedman has admitted that his new job involves the same duties and responsibilities that he had for Clear Channel. For example, Friedman will be called upon to formulate and implement for Tribune content, programming, and marketing plans and strategies to counter the very same plans and strategies to

which he had access – and indeed, in most cases, that he helped to formulate – while employed by Clear Channel.  There is no way that Friedman can formulate or implement strategies for the Tribune on a clean slate.

36.    Clear Channel has spent millions of dollars developing the information that Friedman possesses regarding Clear Channel's Online/Interactive Business, and that information is of unquestionable and substantial value to the Tribune.  For example, knowing which content, programming, and features that Clear Channel has in the development pipeline and the schedule and strategy for their launch would tell Tribune where, when, and how the next competitive battles will be fought, assist it in designing its own strategies and scheduling its own development program, and allow Tribune to unfairly compete with Clear Channel.  Further, Friedman knows Clear Channel's information regarding the comparative profitability and other performance metrics regarding the different types of programming and content, and this would allow the Tribune an unfair, windfall ability to accelerate its efforts and success in monetizing its own online initiatives.  Even a slight advantage in the marketplace could mean millions of dollars of sales gained or lost.

37.    By hiring Friedman in breach of his Employment Agreement and placing him in a position so like the ones he held at Clear Channel, Tribune is poised to acquire, and has placed itself in a position where it will necessarily acquire, Clear Channel Confidential Information under circumstances such that it knew or should have known of its confidential nature, and it knew or should have known that Friedman was not to disclose the information or use it for his own benefit or for the benefit of the Tribune.

**Irreparable Injury and the Need for Injunctive Relief**

38.　　In addition to the lost sales and other compensable injuries that Clear Channel clearly will suffer as a result of Defendants' conduct, Clear Channel will, absent the equitable intervention of this Court, suffer irreparable injury for which it has no adequate remedy at law, for example because its valuable Confidential Information is being and will continue to be disclosed and used against it in the marketplace, and its relationships with its vendors and clients will be irreparably damaged. Once used by or disclosed to a competitor, the value of intellectual property may be reduced or even lost forever, and Clear Channel will suffer the lasting and irreparable effects of the unfair competition resulting from Friedman's violation of his confidentiality and non-compete obligations and Defendants' improper use and disclosure of Clear Channel's Confidential Information.

**COUNT I – VIOLATION OF THE**
**COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**
**(Defendant Friedman)**

39.　　Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

40.　　As described above, Friedman used Clear Channel's computers to engage in conduct that was not authorized by Clear Channel and indeed was expressly prohibited, *inter alia*, by the Employment Agreement and by Clear Channel's Employee Guide.

41.　　By engaging in the conduct listed above, Friedman used Clear Channel's computers and computer system to deceptively and fraudulently access Clear Channel Confidential Information, to copy it and then remove the information from Clear Channel's system, and to transmit it out of Clear Channel's system to his personal email address and to the Tribune, as expressly prohibited by the Employee Guide, all for the purpose of gaining

exclusive possession of, and using, that information to further Defendants' interests to the detriment of Clear Channel.

42.    By engaging in the conduct described above, Friedman knowingly, purposefully, and without authorization or in excess of his authorization, (i) transmitted a "program, information, code, or command" to his Clear Channel-owned computer, (ii) accessed Clear Channel's computer, computer system, and the information stored therein, in a manner and for a purpose not authorized by Clear Channel, and (iii) fraudulently gained access to Clear Channel's computer system and its Confidential Information to transmit that information outside of Clear Channel to his personal email account and thereafter delete it from Clear Channel's system, (iv) thereby obtaining valuable information and data, damaging the integrity and value of Clear Channel's systems and information, and causing damage to Clear Channel in violation of 18 U.S.C. § 1030.

43.    The computers with which Friedman received, accessed, and sent Clear Channel's Confidential Information without authorization, as described above, were used in interstate commerce and are "protected computers" within the meaning of 18 U.S.C. § 1030, and the email transactions described above took place in interstate commerce.

44.    The damage caused Clear Channel by Friedman's misuse and misappropriation of computer data exceeds $5,000.

### COUNT II — BREACH OF CONTRACT
### (Defendant Friedman)

45.    Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

46.    Defendant Friedman had a valid and binding contract with Clear Channel. Clear Channel complied with its obligations under those contracts.

47.    Friedman has breached his contract by engaging in the conduct described above, for example by acting for the benefit of the Tribune prior to the end of his employment with Clear Channel and prior to the end of his employment term, accepting competitive employment with the Tribune prior to the expiration of the non-compete provision contained in the Employment Agreement, and disclosing Clear Channel Confidential Information.

48.    The competitive restrictions contained in the Employment Agreement are reasonable, and they do not impose a greater restraint than is necessary to protect the goodwill or other business interest of Clear Channel.

49.    As a direct and proximate result of Friedman's breaches of contract, Clear Channel has suffered and will continue to suffer great injury and damage, in an amount to be proven at trial.

### COUNT III — BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (Defendant Friedman)

50.    Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

51.    As a key executive of Clear Channel entrusted with Confidential Information, Friedman owed Clear Channel a fiduciary duty and duties of confidentiality and loyalty.

52.    Friedman's conduct described above violated his duties, and is the proximate cause of great injury, damage, and detriment to Clear Channel.

### COUNT IV – TORTIOUS INTERFERENCE
### (Defendant Tribune)

53.    Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

54.    Clear Channel had a valid contract with, and valid business expectancy with, Friedman.  The Tribune knew of that contract and expectancy.

55.    The Tribune, by engaging in the conduct described above, tortiously and without justification or privilege interfered with Clear Channel's contract and relationship with Friedman and its expectance that its contract and relationship would continue.  As a proximate result of Defendants' interference, Friedman has breached his Employment Agreement with Clear Channel as described above, to the great injury, damage, and detriment of Clear Channel.

## COUNT V – INTERFERENCE WITH AND INDUCEMENT OF BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (Defendant Tribune)

56.    Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

57.    By virtue of his position with Clear Channel and the responsibility, trust, and confidence with which Clear Channel had entrusted him with respect to its Confidential Information and business affairs, Friedman owed to Clear Channel a fiduciary duty as well as duties of loyalty and confidentiality.

58.    The Tribune was aware of the duties owed to Clear Channel by Friedman.

59.    By the actions described above, the Tribune purposefully, intentionally, willfully, and maliciously interfered with and induced the breach of Friedman's duties to Clear Channel, and such interference and inducement is the proximate cause of great injury, damage, and detriment to Clear Channel.

## COUNT V — MISAPPROPRIATION OF TRADE SECRETS
### (All Defendants)

60.    Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

-20-

61.    The Confidential Information described above constitutes "Trade Secrets" under Illinois law, as embodied in the Illinois Uniform Trade Secrets Act ("IUTSA"), 765 ILCS 1065/1 et seq., and that information has been and will be misappropriated by Defendants, in that the Confidential Information is technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process or financial data, or list of actual or potential customers or suppliers, that is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

62.    Defendants' conduct described above, including but not limited to Friedman's exercising control over the Confidential Information, causing it to be deleted from Clear Channel's systems, using it without authorization for his own purposes, sending it outside of Clear Channel, and sending it to the Tribune; and Defendants' inevitable future conduct in using and making reference to that information as Friedman performs his new job for the Tribune, constitutes both actual and threatened use and disclosure of the Confidential Information in violation of the IUTSA.

63.    Defendants' violations of the IUTSA described above have been and will be the proximate cause of great injury, damage, and detriment to Clear Channel.

### COUNT VI — UNFAIR COMPETITION
### (All Defendants)

64.    Clear Channel incorporates and restates Paragraphs 1 through 38 above as if fully set forth herein.

65.    The conduct described above constitutes unfair competition, and is the proximate cause of great injury, damage, and detriment to Clear Channel.

**WHEREFORE** Plaintiff Clear Channel Broadcasting, Inc. demands the following relief:

1.      Against Defendant Friedman: Temporary and Preliminary Injunctive Relief in aid of arbitration and in order to protect Clear Channel's rights pending arbitration:

(a) enjoining Friedman from participating in the creation, programming, and/or distribution of news, entertainment, or informational content for delivery via "internet protocol (IP)" (whether through the internet or wireless transmission) to computers, cell phones, or other handheld electronic devices in the United States, at least until the end of 2008 but for a period long enough to give Clear Channel the benefit of a non-compete of a period equal to the number of months for which Clear Channel is obligated to pay, and pays, severance to Friedman, as described above;

(b) enjoining Friedman from hiring or assisting in the hiring of any Clear Channel employee and from encouraging, soliciting, or inducing any Clear Channel employee to resign from Clear Channel;

(c) enjoining Friedman from performing any duties for the Tribune that would result in actual or inevitable disclosure of Clear Channel's Confidential Information;

(d) enjoining the use and disclosure of Clear Channel's Confidential Information; and

(e) directing Friedman to immediately return to Clear Channel any and all documents, data, and/or files (whether in paper or electronic form) containing or reflecting or referring to any of Clear Channel's Confidential Information, including all copies, as well as all portable storage devices used in conjunction with Friedman's Clear Channel computer, and/or used to transfer Clear Channel information to or from, or to access Clear Channel information on, that computer.

2.       Against Defendant Tribune:

(a)       Damages for all of Clear Channel's compensable injuries and for Tribune's unjust enrichment, in an amount to be proven at trial, including but not limited to lost profits, disgorgement of all benefits reaped by the Tribune, plus interest and costs;

(b)       An accounting and a constructive trust as to all funds and other benefits received by Tribune as a result of its wrongdoing;

(c)       Appropriate injunctive relief:

(i) enjoining Tribune from interfering with, inducing, assisting, aiding, or abetting Friedman or any other Clear Channel employee to breach his or her agreement with Clear Channel;

(ii) enjoining Tribune from employing, engaging, or retaining Friedman, or otherwise receiving services from Friedman, with respect to the creation, programming, and/or distribution of news, entertainment, or informational content for delivery via "internet protocol (IP)" (whether through the internet or wireless transmission) to computers, cell phones or other handheld electronic devices in the United States, at least until the end of 2008 but for a period long enough to give Clear Channel the benefit of a non-compete of a period equal to the number of months for which Clear Channel is obligated to pay, and pays, severance to Friedman, as described above;

(iii) sufficient to give Clear Channel the benefit of the bargain contained in the Employment Agreement, to compensate Clear Channel for the unfair advantage obtained by defendant Tribune through its unlawful conduct, and to protect Clear Channel's Confidential Information from future and continued misappropriation;

(e)    An order directing Tribune to immediately return to Clear Channel any and all documents, data, and/or files (whether in paper or electronic form) containing or reflecting or referring to any of Clear Channel's Confidential Information, including all copies;

(f)    Reimbursement for all expenditures reasonably and necessarily incurred by Clear Channel to verify which data and files were improperly accessed and transmitted by Defendants, and to what extent its data and information, computers, and computer systems were misused, altered, damaged, or deleted by Defendants;

(g)    Attorneys fees and costs;

(h)    Exemplary and punitive damages in an amount to be proven at trial; and

(i)    Such other and further other relief that this Court deems just and proper.

Dated:  May 19, 2008

                              /s/ Roger Pascal
                              Roger Pascal
                              Linda K. Stevens
                              Julie Furer Stahr
                              SCHIFF HARDIN LLP
                              6600 Sears Tower
                              Chicago, Illinois  60606
                              (312) 258-5500

                              *Attorneys for Plaintiff Clear Channel Broadcasting, Inc.*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, the undersigned verifies that he is an authorized representative of Clear Channel Broadcasting Inc. and verifies under penalty of perjury that the factual statements set forth in the foregoing pleadings are true and correct to the best of his knowledge and belief.

Date: May 18, 2008

Clear Channel Broadcasting Inc.

By: _____
Gerrit Meier

**GERRIT MEIER**
**COO**
**CCOMR**

CHI\5740167.2

-25-

```
08 cv 2884
JUDGE GOTTSCHALL
MAGISTRATE JUDGE COX
```

Exhibit A

## EMPLOYMENT AGREEMENT

This Employment Agreement is entered into this 20th day of December, 2005 (the "Effective Date") between Clear Channel Broadcasting, Inc. (the "Company") and Andrew Friedman (the "Employee").

**1.    TERM OF EMPLOYMENT.**

Company hereby agrees to employ Employee, and Employee hereby agrees to be employed by Company, in accordance with the terms and conditions of this Agreement, for the period commencing as of the Effective Date and ending on December 31, 2007 (the "Employment Period" or "Term of Employment"). However, the Employment Period shall be automatically extended from year to year unless either Company or Employee gives written notice of non-renewal by October 1, 2007, or annually on each October 1 thereafter, that the Term of Employment shall not be extended. The term "Employment Period" or "Term of Employment" shall refer to the Employment Period if and as so extended.

If this Agreement is extended pursuant to the foregoing provisions, all terms and conditions of this Agreement shall remain the same; provided, however, that the terms of this Agreement may be modified in accordance with Section 18.

**2.    TITLE AND DUTIES.**

(a)    **Duties.** Employee's title is Vice President, News Content for Clear Channel Online Music & Radio. Employee will perform job duties that are usual and customary for this position, and will perform such additional services and duties that Company may from time to time designate that are consistent with the usual and customary duties of this position. Employee will devote his or her full working time and efforts to the business and affairs of Company; provided, however that Employee may engage in other activities, such as charitable, educational, religious and similar types of activities to the extent that such activities do not prohibit or prevent the performance of Employee's duties under this Agreement or conflict in any material way with the business of Company.

(b)    **Exclusive Services.** During employment with the Company, Employee shall not be employed elsewhere and, except as set forth in the preceding clause (a) of this Section 2, shall not render any services to any other person or business, or acquire any interest of any type in any other business which is in competition with Company, provided, however, that the foregoing shall not be deemed to prohibit Employee from acquiring, solely as an investment, (i) up to 10% of any securities of a partnership, trust, corporation or other entity so long as Employee remains a passive investor in such entity and such entity is not, directly or indirectly, in competition with Company or (ii) up to 5.0% of the outstanding equity interests of any publicly held company.

Initials:

Company:

Employee:

3.   COMPENSATION AND BENEFITS

   (a)   **Base Salary.** The Company will pay the Employee an annual base salary of One Hundred Twenty-five Thousand Five Hundred and Fifty-seven Dollars and No Cents ($125,557.00). Commencing January 1, 2007, annual salary increases shall be no less than 3% of base salary and effective January 1 of each year of the Term of this Agreement.

   (b)   **Vacation.** Employee shall be eligible for vacation days annually, subject to applicable provisions of the Employee Guide.

   (c)   **Performance Bonus.** During the Term of Employment, beginning with the calendar year 2006, Employee shall be eligible for an Annual Bonus based on criteria to be established by the Company and pursuant to the Radio Bonus Plan, as approved in the annual budget. Bonus criteria will be based on the financial and operational performance of the Company, as well as individual goals and objectives established for the Employee and his or her market. The criteria will include consideration for Employee's position and duties. The criteria are subject to changes by the Company. Bonuses earned for any calendar year will be paid no later than February 28th of the following year.

   (d)   **Employment Benefit Plans.** The Employee will be entitled to participate in all pension, profit sharing, and other retirement plans, all incentive compensation plans, and all group health, hospitalization and disability or other insurance plans, sick leave and other employee welfare benefit plans in which other similarly situated employees of the Company may participate as stated in the Clear Channel Employee Guide. Employee acknowledges receipt of the Employee Guide (which is available on the CCRC) and agrees to review and abide by its terms.

   (e)   **Expenses.** The Company will reimburse the Employee for all travel and entertainment expenses, consistent with past business practices, incurred in connection with the Employee's responsibilities upon submission of proper vouchers in accordance with the Company's expense reimbursement policy.

   (f)   **Stock Options or Other Forms of Additional Compensation.** Employee shall be eligible to receive Stock Options or an alternative form of additional compensation, subject to performance criteria, input from the Employee's SVP and/or CEO, and approval from the CCU Board of Directors. In the Company's sole discretion, the Company may at any time (1) alter, suspend or discontinue its stock option grant program or (2) replace the program with an alternative form or method of compensation.

4.   NONDISCLOSURE OF CONFIDENTIAL INFORMATION.

   During the course of employment with the Company, the Company has and will provide the Employee with access to certain confidential information, trade secrets, and other matters which are of a confidential or proprietary nature, including but not limited to the Company's operational, programming, training/employee development, engineering, and sales information,

2

Initials:

Company: _____

Employee: _____

customer lists, business and employment contracts, representation agreements, pricing and ratings information, production and cost data, compensation and fee information, strategic business plans, budgets, financial statements, and other information the Company treats as confidential or proprietary (collectively the "Confidential Information"). The Company provides on an ongoing basis such Confidential Information as the Company deems necessary or desirable to aid the Employee in the performance of his or her duties. The Employee acknowledges that such Confidential Information is confidential and proprietary, and agrees not to disclose such Confidential Information to anyone outside the Company except to the extent that (i) the Employee deems such disclosure or use reasonably necessary or appropriate in connection with performing his or her duties on behalf of the Company; (ii) the Employee is required by order of a court of competent jurisdiction (by subpoena or similar process) to disclose or discuss any Confidential Information, provided that in such case, the Employee shall promptly inform the Company of such event, shall cooperate with the Company in attempting to obtain a protective order or to otherwise restrict such disclosure, and shall only disclose Confidential Information to the minimum extent necessary to comply with any such court order; or (iii) such Confidential Information becomes generally known to and available for use in the industries in which the Company does business, other than as a result of any action or inaction by the Employee. The Employee further agrees that he or she will not during employment and/or at any time thereafter use such Confidential Information in competing, directly or indirectly, with the Company. At such time as the Employee shall cease to be employed by the Company, he or she will immediately turn over to the Company all Confidential Information, including papers, documents, writings, electronically stored information, other property, and all copies of them, provided to or created by him or her during the course of his or her employment with the Company. This nondisclosure covenant is binding on the Employee, as well as his or her heirs, successors, and legal representatives, and will survive the termination or expiration of this Agreement for any reason.

5.    **NONHIRE OF COMPANY EMPLOYEES.**

To further preserve Company's Confidential Information, and for the consideration promised by the Company under this Agreement, during the term of the Employee's employment with the Company and for a period of sixty (60) days after employment ends, the Employee will not, directly or indirectly, (i) hire any current radio employee of the Company, or any subsidiary or affiliate of the Company (including, without limitation, any employee of the Company within the 6-month period preceding the Employee's last day of employment with the Company or within the 60-day period of this covenant); (ii) solicit or encourage any such radio employee to terminate their employment with the Company, or any subsidiary or affiliate of the Company; or (iii) solicit or encourage any such employee to accept employment with Employee or with any business, operation, corporation, partnership, association, agency, or other person or entity with which the Employee may be associated.

3

**Initials:**

Company:

Employee:

**6.    NONSOLICITATION OF CLIENTS.**

To further preserve Company's Confidential Information and for the consideration promised by Company under this Agreement, Employee agrees not to solicit any of Company's radio clients in any market in which Employee has conducted business for the Company for sixty (60) days after employment ends. Specifically, for a period of sixty (60) days after employment ends, regardless of the reason for the end of employment, Employee will not, directly or indirectly, either for himself or herself or for any other business, operation, corporation, partnership, association, agency, or other person or entity, call upon, compete for, solicit, divert, or take away, or attempt to divert or take away current radio customers or radio clients of Company in any market in which Employee has conducted business for the Company. This restriction includes, without limitation, any radio customer with whom Company, or any subsidiary or affiliate of Company, (i) has an existing agreement or business relationship; or (ii) has had an agreement or business relationship within the six-month period preceding Employee's last day of employment with Company.

**7.    LIMITED NON-COMPETITION AGREEMENT.**

**(a)    Non-Compete.** To further preserve the Company's Confidential Information and for the consideration promised by the Company under this Agreement, Employee agrees to a limited non-competition agreement. Specifically, during the Employee's employment with the Company and for a period of sixty (60) days after employment ends, the Employee will not, directly or indirectly, be employed or retained by, own, manage, control, or be connected with, in any capacity whatsoever, whether as an officer, director, shareholder, partner, associate, employee, owner, consultant, provider of professional services or otherwise to any business that distributes audio, video and/or data content, whether such distribution is in the form of analog, digital, cellular, broadband, streaming, "high definition" or otherwise, and whether such distribution is received via radio, television, cable, internet, satellite, wireless or otherwise which is receivable in any counties located in any Designated Market Area (the "DMA") in which Employee has responsibilities and duties under this Agreement or within a 50-mile radius of such DMA as defined by Arbitron. The foregoing shall not prohibit the Employee from owning up to 5.0% of the outstanding stock of any publicly held company. Notwithstanding the foregoing, after the Employee's employment with the Company has terminated, upon receiving written permission by the CEO, the Employee shall be permitted to engage in such competing activities that would otherwise be prohibited by this covenant if such activities are determined in the sole discretion of the CEO in good faith to be immaterial to the operations of the Company, or any subsidiary or affiliate of the Company, in the location in question.

**(b)    Reformation, Severability and Severance.** To the extent the covenant not to compete contained in this Section 7 is prohibited by the law of the state in which Employee is employed, the covenant not to compete shall be deemed stricken. If such occurs, Employee acknowledges that the Company shall not be obligated to pay out any severance as described and detailed in Section 9(d). To the extent the covenant not to compete contained this Section 7 is unenforceable under the law of the state in which Employee is employed, the covenant not to compete shall be reformed to permit its enforcement to the maximum possible extent.

4

Initials:

Company: E.H.

Employee: [signature]

## 8.    TERMINATION.

The Employee's employment with the Company may be terminated only by mutual agreement of the parties or under the following circumstances:

(a)    **Death.** The Employee's employment with the Company shall terminate upon his or her death. (The date of death shall be Employee's termination date.)

(b)    **Disability.** The Company may terminate employment if, as a result of the Employee's incapacity due to physical or mental illness, the Employee is unable to perform the essential functions of his or her employment position on a full-time basis for more than 180 days in any 12 month period, as determined by the Company, subject to applicable law.

(c)    **Termination By The Company.** The Company may also terminate employment with or without Cause. "Cause" means one of the following:  (i) a material act of willful misconduct in connection with the performance of his or her duties, including, without limitation, violation of the Company's policy on sexual harassment, misappropriation of, or material misrepresentation regarding, funds or property of the Company or any of its affiliates other than the occasional, customary and de minimis use of Company property for personal purposes, as determined in the sole discretion of the Company; (ii) non-performance of his or her duties (other than by reason of the Employee's physical or mental illness, incapacity or disability) where such non-performance has continued for more than 10 days following written notice; (iii) refusal or failure to follow lawful directives where such refusal or failure has continued for more than 10 days following written notice; (iv) a felony criminal conviction, a plea of nolo contendere by the Employee, or other conduct by the Employee that has resulted in, or would result in, if he or she were retained in his or her position with the Company, material injury to the reputation of the Company, including, without limitation, conviction of fraud, theft, embezzlement, or a crime involving moral turpitude; (v) a material breach by the Employee of any of the provisions of this Agreement; (vi) a significant violation by the Employee of the Company's employment and management policies, as stated in the Manager's Guide on the CCRC or through other written communications of the Company; or (vii) a breach of the confidentiality representation and warranty stated in Section 17 (i.e., the terms of this Agreement shall remain confidential). If Company elects to terminate for Cause under (c)(v) or (c)(vi), Employee shall have five (5) days after the written notice within which to cure, except where such cause, by its nature, is not curable or the termination is based upon a recurrence of an act previously cured by Employee.

(d)    **Termination By The Employee For Good Cause.** Employee may terminate this Agreement at any time for "Good Cause," which is defined as one of the following: (i) a repeated failure of the Company to comply with a material term of this Agreement after written notice by the Employee specifying the alleged failure; or (ii) a substantial and unusual change in Employee's position, duties, responsibilities, or authority without an offer of additional reasonable compensation as determined by Company in light of compensation  levels for similarly situated employees; or (iii) a substantial and unusual reduction in Employee's duties, responsibilities or authority.  If Employee elects to terminate this Agreement for "Good Cause"

5

Initials:

Company: _____

Employee: _____

as described above in this paragraph, the Company shall have five (5) days after the written notice within which to cure.

## 9.    COMPENSATION UPON TERMINATION.

(a)    **Death.**  If employment terminates by reason of death, the Company will, within 30 days, pay in a lump sum amount to such person as the Employee shall designate in a notice filed with the Company or, if no such person is designated, to the Employee's estate, the Employee's accrued and unpaid base salary and bonus, if any, through the date of termination, and any payments to which the Employee's spouse, beneficiaries, or estate may be entitled under any applicable employee benefit plan (according to the terms of such plans and policies).

(b)    **Disability.**  If employment terminates by reason of his or her disability, the Company shall, within 30 days after such termination, pay in a lump sum amount to the Employee his or her accrued and unpaid base salary and bonus, if any, through the date of termination and any payments to which he or she may be entitled under any applicable employee benefit plan (according to the terms of such plans and policies).

(c)    **Termination By The Company For Cause:**  If employment is terminated by the Company for Cause, the Company will, within 30 days, pay in a lump sum amount to the Employee his or her accrued and unpaid base salary and any payments to which he or she may be entitled under any applicable employee benefit plan (according to the terms of such plans and policies).

(d)    **Termination With Severance.**

(1)    Termination By Company Without Cause/Termination By Employee for Good Cause – Severance and Non-Compete:  If employment is terminated by the Company without Cause and other than by reason of death or disability, or if this Agreement is terminated by Employee for Good Cause under Section 8(d), the Company will, within 30 days, pay in a lump sum amount to the Employee his or her accrued and unpaid base salary through the date of termination and any payments to which he or she may be entitled under any applicable employee benefit plan (according to the terms of such plans and policies). In addition, if the Employee signs a general release of claims in a form and manner satisfactory to the Company, the Company will, within 45 days, pay to the Employee, in periodic payments in accordance with ordinary payroll practices and deductions, the greater of (1) the amount equal to Employee's salary for four months; or (2) the amount equal to Employee's salary for the entire duration of the Employment Period as defined in Section 1 (the "Severance Payments"). Notwithstanding the 60-day period of time noted in Section 7, the non-competition agreement in Section 7 shall apply during the entire period of the severance payout.

(2)    Non-Renewal By Company – Severance and Non-Compete:  If this employment ends because Company gives notice of non-renewal under Section 1, and if Employee signs a general release of claims in a form and manner satisfactory to the Company, the Company will, within 45 days, pay severance to Employee, in periodic payments in

6                          **Initials:**

Company ___

Employee: ___

accordance with ordinary payroll practices and deductions, an amount equal to Employee's salary for four months.  Notwithstanding the 60-day period of time noted in Section 7, the non-competition agreement shall apply during the entire period of the severance payout.

      (3)    <u>Pro Rata Bonus:</u> If the Company terminates employment without cause, or if Employee terminates for Good Cause, Employee shall be eligible for a pro-rata bonus as follows: If Employee has been employed full-time between January 1 and August 31, and if Employee's last day of full-time employment is between September 1 and December 31, Employee will receive a pro-rata portion of the Performance Bonus as outlined in Section 3(e) *only if such bonus would have otherwise been earned by Employee as of the end of the calendar year, if his or her full time employment had not ended on or after September 1.* Calculation and payment of the bonus, if any, will be in accordance with the terms outlined in Section 3(e), on a calendar year basis.

      (4)    <u>Re-hire by Company During Severance Payment Period:</u> If Employee is rehired by the Company during any severance payout period, the severance payments shall cease. However, if Employee's new annualized base salary is less than his or her previous annualized base salary, Company agrees to continue to pay to Employee the difference between Employee's previous annualized base salary and Employee's new annualized base salary for the remainder of the severance payout period.

      (5)    <u>Non-compete:</u> Employee acknowledges that he or she may not opt out of or shorten the noncompetition agreement by declining the severance offered in this section. In any event, Company shall be protected by a noncompetition period of at least 60 days after employment ends, pursuant to the terms of Section 7.

    (e)    **Effect Of Compliance With Compensation Upon Termination Provisions.** Upon complying with Subparagraphs 9(a) through 9(d) above, as applicable, the Company will have no further obligations to the Employee except as otherwise expressly provided under this Agreement or under the terms of any employee benefit plan or stock option plan of the Company.

## 10.    PAYOLA, PLUGOLA, RATINGS DISTORTION AND CONFLICTS OF INTEREST.

(a)    Employee acknowledges familiarity with Sections 317, 507, and 508 of the Communications Act of 1934, as amended ("Communications Act"), and the personal responsibilities and liabilities of Employee created thereby. Employee warrants that neither Employee, nor to the best of Employee's knowledge any other person or entity acting on behalf of Employee, has violated any of the provisions of the Communications Act. Employee further warrants that Employee will fully comply with the Communications Act in the future. Employee shall execute from time to time, at the request of Company, a formal statement certifying that he or she has not violated those provisions. Employee also shall notify Company immediately in writing if there is any attempt to induce Employee to violate any provisions of this Agreement or rules, regulations or policies of the FCC.

7

**Initials:**

Company:

Employee:

(b)     Employee will not accept or receive, either directly or indirectly, money or any other valuable consideration, (other than Employee's compensation paid directly through the Company's payroll department) in connection with or related to Employee's participation, directly or indirectly, in program material broadcast by any station owned or operated by Company, its parent, or any affiliated company, or for playing certain records or broadcasting any matter. Employee will report to the CEO of Radio immediately and in full detail, in writing, the receipt of any such payment or thing of value or any approaches or overtures made to the Employee by anyone not employed by Company to insert, use or otherwise include mention of any product or to use any musical numbers or other matter in the programming of any station owned or operated by Company, its parent or any affiliated company.

(c)     Employee represents and warrants that neither Employee nor any member of Employee's immediate family has any interest, either directly or indirectly, in any record company, retail store, music or video publishing company, internet or new technology interests, concert promotion company, professional singers or musicians. Should Employee acquire or divest any such interest or connection during the Term of Employment, such acquisitions or divestiture shall be promptly reported to Company in writing.

**11.     PARTIES BENEFITED; ASSIGNMENTS.**

This Agreement shall be binding upon the Employee, his or her heirs and his or her personal representative or representatives, and upon the Company and its respective successors and assigns. Neither this Agreement nor any rights or obligations hereunder may be assigned by the Employee, other than by will or by the laws of descent and distribution.

**12.     GOVERNING LAW.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to any choice of law or conflict provisions or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas and the Employee hereby expressly consents to the personal jurisdiction of the state and federal courts located in the State of Texas for any lawsuit arising from or relating to this Agreement.

**13.     DEFINITION OF COMPANY.**

As used in this Agreement, the term "Company" shall include Clear Channel Broadcasting, Inc., and any of its past, present and future divisions, operating companies, subsidiaries and affiliates.

8

Initials:

Company: _____

Employee: _____

14.   **LITIGATION AND REGULATORY COOPERATION.**

During and after the Employee's employment, the Employee shall reasonably cooperate with the Company in the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company which relate to events or occurrences that transpired while the Employee was employed by the Company. The Employee's cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness at the request of the Company at a limited number of mutually convenient times. During and after the Employee's employment, the Employee also shall cooperate fully with the Company in connection with any investigation or review of any federal, state or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while the Employee was employed by the Company. The Company will pay the Employee on an hourly basis (to be derived from his or her base salary as of Employee's last day of employment) for requested litigation and regulatory cooperation that occurs after the end of employment, and reimburse the Employee for all reasonable costs and expenses incurred in connection with his or her performance under this paragraph, including, but not limited to, travel expenses, reasonable attorneys' fees and costs.

15.   **INDEMNIFICATION AND INSURANCE; LEGAL EXPENSES.**

The Company shall defend and indemnify the Employee to the fullest extent permitted by law in effect at the time of the subject act or omission, for acts committed in the course and scope of employment, and the Employee will be entitled to the protection of any insurance policies that the Company may elect to maintain generally for the benefit of similarly situated employees to cover costs, charges and expenses incurred or sustained by him or her in connection with any action, suit or proceeding to which he or she may be made a party by reason of his or her being or having been an employee of the Company.

16.   **ARBITRATION.**

The parties agree that any dispute, controversy or claim, whether based on contract, tort, statute, discrimination, retaliation, or otherwise, relating to, arising from or connected in any manner to this Agreement, or to the alleged breach of this Agreement, or arising out of or relating to Employee's employment or termination of employment, shall, upon timely written request of either party be submitted to and resolved by binding arbitration. The arbitration shall be conducted in the market in which Employee works. The arbitration shall proceed in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association ("AAA") in effect at the time the claim or dispute arose, unless other rules are agreed upon by the parties. Unless otherwise agreed to by the parties in writing, the arbitration shall be conducted by one arbitrator who is a member of the AAA and who is selected pursuant to the methods set out in the National Rules for Resolution of Employment Disputes of the AAA. Any claims received after the applicable/relevant statute of limitations period has passed shall be deemed null and void. The award of the arbitrator shall be a reasoned award with findings of fact and conclusions of law. Either party may bring an action in any court of

9

Initials:

Company:

Employee:

competent jurisdiction to compel arbitration under this Agreement, to enforce an arbitration award, and to vacate an arbitration award. However, in actions seeking to vacate an award, the standard of review to be applied by said court to the arbitrator's findings of fact and conclusions of law will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury. The Company will pay the actual AAA costs of arbitration excluding attorney's fees. Each party will pay its own attorneys fees and other costs incurred by their respective attorneys.

## 17.    REPRESENTATIONS AND WARRANTIES OF THE EMPLOYEE.

The Employee represents and warrants to the Company that all terms and conditions of this Agreement shall be kept strictly confidential, except as may be disclosed to Employee's spouse, accountants or attorneys. The Employee represents and warrants to the Company that he or she is under no contractual or other restriction which is inconsistent with the execution of this Agreement, the performance of his or her duties hereunder or the other rights of Company hereunder. The Employee also represents and warrants to the Company that he or she is under no physical or mental disability that would hinder the performance of his or her duties under this Agreement.

## 18.    MISCELLANEOUS.

This Agreement contains the entire agreement of the parties relating to the subject matter hereof. This Agreement supersedes any prior written or oral agreements or understandings between the parties relating to the subject matter hereof. No modification or amendment of this Agreement shall be valid unless in writing and signed by or on behalf of the parties hereto. The failure of a party to require performance of any provision of this Agreement shall in no manner affect the right of such party at a later time to enforce any provision of this Agreement. A waiver of the breach of any term or condition of this Agreement shall not be deemed to constitute a waiver of any subsequent breach of the same or any other term or condition. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be held invalid or unenforceable, such invalidity and unenforceability shall not affect the remaining provisions hereof, except as specifically noted in this Agreement, or the application of such provisions to other persons or circumstances, all of which shall be enforced to the greatest extent permitted by law. Company and Employee agree that the restrictions contained in Section 5, 6, and 7, are reasonable in scope and duration and are necessary to protect Company's Confidential Information. If any restrictive covenant is held to be unenforceable because of the scope, duration or geographic area, the parties agree that the court or arbitrator shall have the power to reduce the scope and/or duration and/or geographic area of such provisions, and in its reduced form, such provision shall then be enforceable. Should Employee violate the provisions of Sections 5, 6, or 7, then in addition to all other rights and remedies available to Company at law or in equity, the duration of those covenants shall automatically be extended for the period of time which Employee began such violation until he or she permanently ceases such violation. The headings in this Agreement are inserted for convenience of reference only and shall not be a part of or control or affect the meaning of any provision hereof.

10

Initials:

Company:

Employee:

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of the date first written above.

DATE: 12-20-05

Andrew Friedman
Vice President, News Content
Clear Channel Online Music & Radio

**CLEAR CHANNEL BROADCASTING, INC.**

DATE: 1/12/06

By:

Name: Evan Harrison
Title: Executive Vice President,
Clear Channel Online Music & Radio

11

**Initials:**

Company:

Employee:

Exhibit B



# Employee Guide

Revised July 2006

# Table of Contents

| | |
|---|---|
| Letter from Lowry Mays | 3 |
| Clear Channel Creed | 4 |
| About Clear Channel | 5 |
| About this Guide | 5 |
| At Will Employment | 5 |
| Signals for Success | 5 |
| Equal Opportunity Employment | 6 |
| Open Door Policy | 6 |
| Employee Hotline | 7 |
| Harassment | 7 |
| Threats, Violence, and Weapons | 9 |
| Security | 10 |
| Substance Abuse Policy | 13 |
| Safety | 14 |
| Insurability | 15 |
| Employee Classifications | 15 |
| Confidentiality | 16 |
| Media Contacts | 17 |
| Electronic Recording of Conversations | 17 |
| Electronic Information and Internet Usage | 18 |
| Identity Information Privacy Policy | 20 |
| Copyright | 21 |
| Nepotism | 21 |
| Personal Relationships | 21 |
| Salary and Benefits | 22 |
| Attendance & Punctuality | 22 |
| Work Hours and Overtime | 22 |
| Tobacco | 23 |
| Personal Property | 23 |
| Cell Phone Use While Driving | 23 |
| Leaves of Absence | 23 |
| Family & Medical Leave | 24 |
| Medical Leave | 26 |
| Military Leave | 26 |
| Personal Leave | 27 |
| Jury Duty | 27 |
| Workers' Compensation Leave | 27 |
| Sick Leave | 28 |
| Bereavement Leave | 29 |
| Vacation | 29 |
| Holidays | 31 |
| Clear Channel Resource Center (CCRC) | 32 |
| California Addendum | 34 |
| Clear Channel Radio Addendum | 41 |
| Clear Channel Outdoor Addendum | 44 |

Unless specifically authorized, all visitors to any Clear Channel facility are to be escorted at all times. All visitors to an office or facility maintained by Clear Channel should be directed to the reception area and remain there until proper identification and badging are completed. If you escort a visitor in, you should escort the visitor back to the reception area when she or he finishes the visit. If you escort a visitor in, but leave the visitor with another employee, it is your responsibility to make sure that the visitor is taken back to the reception area when she or he finishes the visit. If you see an unescorted visitor, escort them back to the reception area and notify security. Unescorted visitors or non-employees are not allowed inside an office after normal business hours or on weekends and holidays.

## Offices and Related Facilities

You must never disable, disarm, obstruct, or tamper with any doors or fire exits; locks, alarms, or other security devices; smoke alarms, fire alarms, or security lights; fire extinguishers or sprinklers; or similar devices or equipment. If you hear an alarm or suspect a malfunction with any building systems, please notify security immediately. Clear Channel expects every employee's cooperation in the event of a fire drill or fire, e.g., by expediently evacuating the building should it become necessary; severe weather drill or alert; or in response to any comparable threatening event.

If you are issued a building key or a building access card, do not loan it to anyone else, even another employee, and do not copy or duplicate a building key or access card. If the office where you work is equipped with a passive security system (a device which requires a code, card key, or combination for entry), you must never share the code, card key, or combination with anyone. If you violate this policy you will be subject to disciplinary action up to and including unpaid suspension and/or termination.

## Computer System Access

*Generally*

The following outlines the acceptable use of computing resources and network systems at Clear Channel. These rules are in place to protect the employee and Clear Channel. Inappropriate use exposes Clear Channel to risks including virus attacks, compromise of network systems and services, and legal issues.

All authorized users are responsible for the security of their passwords and accounts. Users are required to take reasonable measures to prevent unauthorized use of the computing resources made available to them. To ensure the security of your system when your PC is unattended, it must either be:
   a.  in a locked room
   b.  password protected (control+alt+delete)
   c.  with a screen saver password
   d.  logged off of the network
   e.  shut down
Password protected screen savers should be set to automatically activate after 15 minutes of inactivity. To set your screen saver, go to "Start," then "Settings," then "Control Panel," then "Display," then "Screen Saver" and set the "Wait" time to 15 minutes or less, and check the box next to "On resume, password protect."

11

Laptop computers and personal digital assistants ("PDAs," which include Blackberry devices and mobile phones which can send and receive email) should be protected from theft at all times. Laptop computers should be secured to an unmovable piece of furniture using a locking device when unsupervised. Both laptop computers and PDAs should be protected from unauthorized access by a login and password.

*Passwords*

If you are issued an application or network username/password, treat it as sensitive, confidential information.

- Do not share it with anyone else, even another employee.
- Do not leave the access information where it could be found by another employee or someone outside of the company.
- While you should of course choose a password you can remember easily, the best passwords do not include words that are familiar to the general public (in fact the hardest passwords to "crack" incorporate foreign language words); you should not use in your password relatively obvious words like sports team names, college names, etc.

Unauthorized use of your username/password information could subject you to appropriate administrative disciplinary measures, possible job loss, and even criminal prosecution. Use of Clear Channel applications and network connections are a privilege that can be revoked if abused.

*Special precautions:*

If you take sensitive information (e.g., personal information concerning company employees, strategic business plans, etc.) in electronic format out of your office (even if to another Clear Channel office), you should password protect all files containing such information (whether such files are on a notebook computer or in a storage medium like a compact disk). If you need any assistance in applying passwords to any files or desire assistance with even stronger security measures, please contact the Help Desk (1-888-271-2395; or `helpdesk@clearchannel.com`).

If your laptop computer is stolen or lost, immediately inform the Help Desk (1-888-271-2395; or helpdesk@clearchannel.com), so that they can help you change your network password, and prevent unauthorized access to the company network using your laptop computer. In addition, you should immediately contact the Legal Department concerning the theft of any company computer equipment or company files.

Additional computer usage policies are found on the CCRC in the Clear Channel Information Technology Security Policy at the links below. Each computer system user is required to adhere to these policies. Please be sure to download and read the IT Security Policy for more information on your responsibilities.

http://mycorp.clearchannel.com/C4/C18/Standards/Articles/IT32-02.aspx

http://mycorp.clearchannel.com/C4/C18/Standards/Articles/IT43-04.aspx

Different or additional security measures may apply where you are assigned to work. Be sure you know what those are and follow them at all times!

# Substance Abuse Policy

### (Outdoor employees see Clear Channel Outdoor Addendum)

Clear Channel is committed to providing a safe work environment and to fostering the well-being and health of its employees. That commitment is jeopardized when any Clear Channel employee illegally uses drugs or alcohol on the job, comes to work with these substances present in his/her body, or possesses, distributes, or sells drugs in the workplace. For this reason, Clear Channel has developed a substance abuse policy that all must follow. The policy and guidelines are described below.

State law may also require other substance abuse and drug testing policies for certain locations. If you have a question about whether there is a different policy that applies to your workplace, contact your supervisor.

An employee may occasionally be asked to attend a business event where alcohol is served. Clear Channel neither requires nor expects any employee to consume alcohol at these events. If you do consume alcohol while on Company business, Clear Channel requires you to act responsibly and professionally. Under no circumstances should you compromise your own safety, or that of others. Be certain of, and make satisfactory arrangements for, safe transportation back to your home. Clear Channel will reimburse your taxi fare from an event to your home under these circumstances.

It is a violation of company policy to engage in the illegal use of drugs or with a level of alcohol that may impair your performance on the job.

Employees who are taking prescribed medication which could affect their job performance or jeopardize workplace safety should report this to their supervisor before starting work. If necessary, Clear Channel will take appropriate action to make sure everyone is safe.

Violations of this policy may result in disciplinary action up to and including unpaid suspensions and/or terminations.

### Request for Referral

- It is the responsibility of the company's supervisors to counsel employees whenever they see changes in performance or behavior that suggests an employee is under the influence of alcohol or other drugs. Although it is not the supervisor's job to diagnose personal problems, the supervisor should encourage such employees to seek help and advise them about available resources for getting help. Everyone shares responsibility for maintaining a safe work environment and co-workers should encourage anyone who uses alcohol or

13

otherwise required by law), and other opportunities that may be available to regular full-time employees.

**Seasonal or Temporary**

These employees are hired to fill seasonal positions or temporary positions. These employees are expected to work less than 36 consecutive weeks per year. They are not eligible for paid leave, paid holidays, paid sick leave, benefits (unless otherwise required by law), or other opportunities that may be available to regular full-time employees.

# Confidentiality

Clear Channel expects each employee to exercise discretion in the access and use of company information and information systems. In the course of your work, you may have access to Clear Channel's valuable confidential information about, including (but not limited to):

- Business promotion strategies and plans (these may be in writing, communicated orally, or exist as a matter of practice or custom).

- Proposals to clients or potential clients, including information compiled or prepared to assist with proposals to clients or potential clients.

- Client lists or prospective (e.g., "target") client lists.

- Client requests (whether presented orally or in writing) for information, proposals, promotional assistance, or other information, which relates to Clear Channel or to the client.

- Event or potential event information, including dates, locations or costs, ticket prices, on-sale information, and ticket price determination formulas, methods, strategies, or variations.

- Information regarding other employees and their employment with Clear Channel, including personal information that you learn in the course of your job duties.

- Information regarding the talents, skills, abilities, and work experience of other employees.

- Computer hardware, software, or computer-related information, whether purchased or created by or on behalf of Clear Channel, as used or applied to Clear Channel's business.

- Information, which pertains, directly or indirectly, to contemplated or actual business relationships between Clear Channel and businesses that engage in activities related to Clear Channel business, e.g., promoters, advertising or marketing firms, etc.

- The identity of consultants, vendors, or other third parties that provide or seek to provide services to Clear Channel, together with the nature of any such services.

16

- Personal information regarding non-employees, which is obtained through Clear Channel's promotional activities (such as information regarding Internet website visitors, contest winners, email newsletter subscribers, etc.)

It is your responsibility to keep this confidential information confidential. You must also not use any of this confidential information except as directly necessary for your job. This policy does not include information which is routinely made open to the public. If you have any doubt, don't disclose the information.

If you have a question about whether particular information is confidential, ask your manager.

You may not make or keep copies of records of any type which contain trade secrets or confidential information, unless you are required to make the copies as part of your job for business reasons only.

Clear Channel also may require you to sign a confidential information protection and non-disclosure agreement as consideration for your employment or continued employment. Any such agreement will only supplement this policy.

Under no circumstances may you reveal, use, or rely on a previous employer's trade secrets or confidential information in your work for Clear Channel. If you have confidential information from a previous employer, if you are subject to an agreement regarding your previous employer's trade secrets or confidential information, or if your previous employer required you to sign a non-competition agreement, you must immediately let your supervisor know.

Violation of this policy will not be tolerated, and we will take appropriate disciplinary action up to and including unpaid suspension and/or termination.

This Confidentiality policy is not intended to prohibit employees from discussing with one another, or with third parties who are not competitors of the Company, wages, hours, and other terms and conditions of employment.

## Media Contacts

You may never respond to an inquiry or request or a comment or statement from a member of the media (e.g., a news reporter, television or radio reporter, reporter, or columnist), unless your work for Clear Channel specifically authorizes you to speak to the media on behalf of Clear Channel. Relay all such requests to a designated media contact or your manager.

## Electronic Recording of Conversations

Do not record any conversations unless required in the course of your job duties. Employees who violate this policy may receive disciplinary action up to and including unpaid suspension and/or termination.

17

# Electronic Information and Internet Usage

Clear Channel provides employees with different kinds of electronic communications devices that help us be more efficient and maximize our business efforts. These include (but aren't limited to) computers, e-mail, Internet access, fax machines, telephones, voice mail, and pagers. All electronic communications and internet technology, including all software and hardware, remain the sole property of Clear Channel.

Employees do not have personal privacy rights when it comes to information composed, created, received, downloaded, retrieved, stored, or sent using electronic communications devices. Clear Channel also maintains an audit log of every Internet access transaction. Clear Channel has the right to access and review electronic files, messages, mail, etc. We might need to do this for business reasons, or to make sure there is no misuse or violation of Company policy or any law. This may happen at any time and without notice to you. By accessing Clear Channel's e-mail or Internet system, all employees knowingly and voluntarily consent to electronic monitoring, and they acknowledge Clear Channel's right to conduct such monitoring.

Electronic communications and the Internet are for use on job-related activities. However, it is permissible to use e-mail and the Internet for personal (not for profit) reasons on a very limited basis.   Make sure the information in your e-mails is accurate, appropriate, ethical, and lawful.

Proper use of email systems will allow the Company and its employees to take efficient advantage of this important resource. Email system users who violate this policy are subject to immediate discipline up to and including termination.

- All electronic communications pertaining to Clear Channel business, property, personnel, or benefits must be conducted using the Clear Channel corporate email system only. External personal email systems such as Hotmail, Yahoo, GMail, and POP3 accounts must not be used for this purpose.
- Only Clear Channel email addresses will be used by Clear Channel corporate when disseminating confidential or personal information via email.
- All messages sent in the mail systems must be consistent with proper business practices and comply with all applicable laws and Company policies and procedures, including policies concerning copyright infringement, confidentiality, discrimination, harassment and equal employment laws. Users should have no expectation that materials composed, sent or received over the mail systems are private or confidential. The Company may access, monitor, read, disclose, and delete messages and attachments in the mail systems at any time and for any reason without permission of or advance notice to the user.
- In order to keep enough room to store messages on the mail systems, and to maximize efficiency of the mail systems, each employee user has a limited amount of storage capacity in his or her user mailbox. Once the mailbox reaches the size limit (currently 85 MB), a warning message will be sent, instructing the user to remove messages from the users mailbox. Once the mailbox reaches 100 MB of data, the user will not be able to send messages until such time as the mailbox size falls below 100 MB. Increased storage capacity is available for a charge. For details, see Section VII Message Storage, Retention and Deletion in the policy.
- On occasion, users may have emails that may relate to a matter involved in a pending or foreseeable lawsuit or legal proceeding. It may be prudent, or required by law, that the Company preserve (and not delete) such emails. If you believe that you have any such

18

emails, or are uncertain whether a particular email should be deleted, contact the Company's Legal Department to obtain advice and instruction. Such emails may not be deleted until and unless advice and instruction is received from the Company's Legal Department. This is an important exception to the Company's general Email Policy.
- The Company performs back-ups of the mail systems every day, and retains those back-ups for 5 days. The back-ups are for disaster recovery of the mail systems. After that 5-day period, each back-up tape is erased and recycled.

Sending or posting confidential or sensitive material, trade secrets, or proprietary information outside Clear Channel is prohibited. This includes sending or posting messages or material that could damage Clear Channel's image or reputation (both from work or home, and during working or nonworking time). Employees who misuse communications devices or engage in defamation, misappropriation of trade secrets, misappropriation or unauthorized communication of confidential Company information or related actions using Clear Channel's communication devices will be appropriately disciplined up to and including unpaid suspension and/or termination.

Any information you compose, transmit, access, or solicit must not contain content that could be considered discriminatory, slanderous, offensive, obscene, threatening, harassing or intimidating. Other examples of unacceptable content may include (but aren't limited to) viewing or exchanging pornography or other obscene materials.

Many computer systems and tools are put into place enabling Clear Channel to be an industry leader. Many of these systems require authentication (system access) by means of username and password. In order to effectively maintain data confidentiality and to prohibit unauthorized access to these systems, please do not share your username and password. Please always adhere to the following password principles:

- All passwords are to be treated as sensitive, confidential information
- Do not share passwords with anyone, including administrative assistants
- Do not reveal a password over the phone to ANYONE, including CC Help Desk or any other computer support personnel.
- Do not reveal a password in an email message
- Do not reveal a password to your supervisor
- Do not talk about a password in front of others
- Do not hint at the format of a password (e.g., "my family name")
- Do not reveal a password on questionnaires or security forms
- Do not share a password with family members
- Do not reveal a password to co-workers while on vacation

Company resources (computers and network connections) are not to be used to distribute data which may be protected by copyright. This includes providing for distribution of MP3 files using a file sharing methods such as Kazaa or the Gnutella network. P2P File Sharing applications have been used for the distribution of copyrighted content. Napster, Morpheus, KaZaA, WinMX, EDonkey, Grokster, Aimster, Madster, AudioGalaxy and Gnutella, are examples of the kinds of P2P File Sharing software which can be used inappropriately to share copyrighted content. The CCW wide area network is configured to prohibit P2P file transfers. Computer users are not to install P2P applications as they will not successfully transfer files. Any employee found to have

19

Exhibit C

**CLEAR CHANNEL COMMUNICATIONS, INC.**


**CODE OF BUSINESS CONDUCT AND ETHICS**

# Table of Contents

Foreword...................................................................................................... iii

Introduction ................................................................................................... 1

Compliance with Laws ................................................................................... 3
    Antitrust Laws.......................................................................................... 3
    Anticorruption Laws ............................................................................... 3
    FCC Regulations ..................................................................................... 4
Conflicts of Interest........................................................................................ 5
    Doing Business with Family Members .................................................... 6
    Ownership in Other Business .................................................................. 7
    Outside Employment .............................................................................. 7
    Service on Boards.................................................................................... 8
    Business Opportunities ........................................................................... 8
    Loans ...................................................................................................... 8

Policy on Related Party Transactions ............................................................ 9

Gifts and Entertainment.................................................................................. 9
    Accepting Gifts and Entertainment ........................................................ 10
    Giving Gifts and Entertaining ................................................................ 10

Fair Dealing ................................................................................................... 11

Securities Laws and Insider Trading .............................................................. 11

Responding to Inquiries from the Press and Others ....................................... 12

Political Activity ............................................................................................ 13

Safeguarding Corporate Assets ...................................................................... 13

Equal Employment Opportunity and Anti-Harassment.................................. 14

Health, Safety and the Environment ............................................................... 15

Accuracy of Company Records ...................................................................... 15

Record Retention ........................................................................................... 16

Administration of this Code ........................................................................... 16
    Distribution ............................................................................................ 16
    Role of Supervisors and Officers ........................................................... 17
    Reporting Violations............................................................................... 17
    Investigations ......................................................................................... 17
    No Retaliation ........................................................................................ 17
    Approvals................................................................................................ 17
    Waivers .................................................................................................. 18
    Certifications .......................................................................................... 18

Nonretaliation Policy for Employees Who Report Violations of Law ................................. 18
    Description of Responsibilities of our Senior Vice President of
        Human Resources ........................................................................ 19
Asking for Help and Reporting Concerns .......................................................... 20

*Note:* This Code and related policies are current as of April 26, 2006. In some respects our policies may exceed minimum legal requirements or industry practice. Nothing contained in this Code should be construed as a binding definition or interpretation of a legal requirement or industry practice.

To obtain additional copies of this Code, you may contact the Legal Department or access it from the web at http://www.clearchannel.com.

Relations Department.  Please direct all media inquiries relating to our company to the Corporate Communications Department.

## *Political Activity*

We will fully comply with all political contribution laws.  Our funds may not be used for contributions of any kind to any political party or committee or to any candidate or holder of any government position (national, state or local) unless such contribution is permitted by law and complies with our company policy.  All political contributions must be approved in advance by our Chief Executive Officer, President or Chief Legal Officer.

It is against our policy for you to lobby our other employees on behalf of a political candidate during the work day.  It is also against our policy to reimburse an employee for any political contributions or expenditures.  Outside normal office hours, you are free to participate in political campaigns on behalf of candidates or issues of your choosing, as well as make personal political contributions.

## *Safeguarding Corporate Assets*

We have a responsibility to protect company assets entrusted to us from loss, theft, misuse and waste.  Company assets and funds may be used only for business purposes and may never be used for illegal purposes.  Incidental personal use of telephones, fax machines, copy machines, personal computers, e-mail and similar equipment is generally allowed if it is occasional, there is no significant added cost to us, it does not interfere with your work responsibilities and is not related to an illegal activity or outside business.  If you become aware of theft, waste or misuse of our assets or funds or have any questions about your proper use of them, you should speak immediately with your immediate supervisor or you may submit your concern, on an anonymous basis, to the Audit Committee of our Board of Directors by calling the toll-free Employee Hotline.

It is also important that you protect the confidentiality of company information.  Confidential or proprietary information includes all information that is not generally known to the public and is helpful to the company, or would be helpful to competitors.  Proprietary information should be marked accordingly, kept secure and access limited to those who have a need to know in order to do their jobs.

Our business relations are built on trust, and our customers and suppliers count on that trust.  If you learn information from them that is not otherwise public, you should keep that information confidential also.

We must all be sensitive to the impact of comments made over the Internet through public forums such as chat rooms and bulletin boards.  In such forums, you may not post any information about the company including comments about our products, stock performance,

13

operational strategies, financial results, customers or competitors, even in response to a false statement or question. This applies whether you are at work or away from the office. Our company owns all e-mail messages that are sent from or received through the company's systems. We may monitor your messages and may be required to disclose them in the case of litigation or governmental inquiry.

### *Equal Employment Opportunity and Anti-Harassment*

We are committed to providing equal employment opportunities for all our employees and will not tolerate any speech or conduct that is intended to, or has the effect of, discriminating against or harassing any qualified applicant or employee because of his or her race, color, religion, sex (including pregnancy, childbirth or related medical conditions), national origin, age, physical or mental disability, veteran status or any characteristic protected by law. We will not tolerate discrimination or harassment by anyone – managers, supervisors, co-workers, vendors or our customers. This policy extends to every phase of the employment process, including: recruiting, hiring, training, promotion, compensation, benefits, transfers, discipline and termination, layoffs, recalls, and company-sponsored educational, social and recreational programs, as applicable. If you observe conduct that you believe is discriminatory or harassing, or if you feel you have been the victim of discrimination or harassment, you should notify your Employee Relations Specialist or the Employee Hotline immediately.

Not only do we forbid unlawful discrimination, we take affirmative action to ensure that applicants are employed, and employees are treated during employment, without regard to their race, color, religion, sex (including pregnancy, childbirth or related medical conditions), national origin, age, physical or mental disability, veteran status or any characteristic protected by law.

The Human Resources Department has been assigned specific responsibilities for implementing and monitoring affirmative action and other equal opportunity programs. One of the tenants of this Code, however, is that all employees are accountable for promoting equal opportunity practices within our company. We must do this not just because it is the law, but because it is the right thing to do.

For more information concerning our anti-discrimination and anti-harassment policies, you should refer to our Employee Guide. We will not retaliate against any employee for filing a good faith complaint under our anti-discrimination and anti-harassment policies or for cooperating in an investigation and will not tolerate or permit retaliation by management, employees or co-workers. To the fullest extent possible, the company will keep complaints and the terms of their resolution confidential. If an investigation confirms harassment or discrimination has occurred, the company will take corrective action against the offending individual, including such discipline up to and including immediate termination of employment, as appropriate.

08 cv 2884
JUDGE GOTTSCHALL
MAGISTRATE JUDGE COX

# Exhibit D

SEP-08-2006 FRI 09:07 AM

Employee Acknowledgement of Employee Guide (All Non-Union)                    Page 1 of 2



| Home | Corp Services | International | Outdoor | Radio | Television | Channel Guide |       Welcome Andy Friedman

Home > Corporate Services > Human Resources Channel > Forms > Initial Employment

**Left navigation:**
- Acquisitions
- Local Spirit
- Accounting Channel
- Budgeting Channel
- Business Operations Channel
- Human Resources Channel
  - Meet HR/ Get Help
  - HR Essentials
  - New Employees
  - Employee Guide, Code of Conduct, and
  - Arbitration Agreement
  - General Benefits
  - Medical Benefits
  - Vision Benefits
  - Non-Qualified Benefits
  - Life Insurance
  - Dental Benefits
  - Disability Insurance
  - Flex Spending Account
  - 401-K
  - ESPP
  - Policy
  - Stock Options
  - Training Modules
  - Forms
    - Benefits
    - By Title
    - Initial Employment
    - Job Changes
    - Pre-Employment
    - Termination
  - Employee Deals
  - HIPAA
  - Wellness Newsletter
  - Clear Careers
  - Diversity
- Store Channel
  - Information Technology
  - Merchandising Channel
  - Law and Gov't Affairs Channel
  - MBU Channel
  - Presidents Club Channel
  - Real Estate Channel
  - Risk Management Channel
  - Sales Resource Channel
  - Innovation Contest

**Employee Acknowledgement of Employee Guide (All Non-Union) (4133a)**
HR
**Quick Read**
Revised 8/16/06

**Page Options**
Email This Page
Add to Favorites
**Related Content**

Download this Word Document here.

**Employee's Acknowledgement of Receipt
of Employee Guide and Code of Conduct**

**Employee Guide Acknowledgement:**

Employees are required to read and abide by the applicable portions of the Guide and to get help from their supervisor or from the Human Resources Department, if necessary, in understanding the Guide. The Guide will be interpreted consistent with all applicable laws. If any of the policies in this Employee Guide conflict with any local or future laws, the applicable laws will supersede the Employee Guide. The Guide applies to all employees except where modified by specific terms of an express and signed written contract signed the appropriate company official or valid collective-bargaining agreement. The Company may deviate from, amend, modify, supplement, or revoke any of its policies at any time, including the policies contained within this Guide.

Employment at Clear Channel is employment at-will, unless modified by the specific terms of a written employment agreement signed by the appropriate company official. Employment at will means that the employment relationship may be terminated at the will of either the employer or the employee. Employment may be terminated with or without cause and with or without notice by you or Clear Channel. Terms and conditions of employment with Clear Channel may be modified at the sole discretion of Clear Channel with or without cause and with or without notice. Employees who have questions concerning the Guide should contact hr@clearchannel.com or our toll-free number, 888-403-HRCC.

Please sign below to show that you have received a copy or have reviewed the Clear Channel Guide on the CCRC and will abide by Policies:



**SIGNATURE**                                    **EMPLOYEE'S DATE**

_Andy Friedman_
**PRINT NAME, division and location**
_CeomR_
_Northfield, IL_

### Code of Conduct Acknowledgment:

I have been provided with a copy or have reviewed on the CCRC the Code of Business Conduct and Ethics of Clear Channel Communications, Inc. I acknowledge that I have read the code and understand my responsibilities under it. I further acknowledge that I should follow the compliance procedures described in the code if I have any questions or concerns.

_9-8-06_

**SIGNATURE**                                    **EMPLOYEE'S DATE**

_Andy Friedman_
**PRINT NAME, division and location**
_CeomR_
_Northfield, IL_

# EMPLOYEE'S ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE GUIDE 2000

Employees are required to read and abide by the applicable portions of the Guide and to get help from their supervisor or from the Employee Relations Department. if necessary. in understanding the Guide. The Guide will be interpreted consistent with all applicable laws.  If any of the policies in this Employee Guide conflict with any local or future laws. the applicable laws will supercede the Employee Guide. The Guide applies to all employees except where modified by specific terms of an express, and signed written contract signed by a Vice President or higher company official or valid collective bargaining agreement.  The benefits listed in the guide do not apply to employees covered by individual contracts or other agreements or in recognized union bargaining units, unless otherwise expressly indicated in writing.  Except as provided by the full arbitration policy, or an individual contract, or an applicable collective bargaining agreement, the Company may deviate from, amend, modify, supplement, or revoke any of its policies at any time, including the policies contained within this Guide.

Employment with Clear Channel is "at-will."  This means that either the employee or the Company may terminate the employment relationship at any time for any reason, with or without notice. Every situation is different, and individual circumstances require individual solutions. So the Guide is not a contract of employment. Nothing in the Employee Guide creates a contract of employment, is a guarantee of any procedure, benefit or policies, or in any way modifies the normal at-will employment relationship. No supervisor or manager or other employee has the authority to alter the at-will relationship or the general policy summarized in this Guide, either orally or in writing.  Negotiated exceptions to this rule are effective only if in writing and signed by a Vice President or higher authority and the employee or, where applicable, are contained in a negotiated collective bargaining (union) contract.  Employees who have questions concerning the Guide should contact the Employee Relations Department at hr@clearchannel.com or (210) 822-2828.

**Please sign below to show that you have received a copy of the Clear Channel Guide:**

_____
**EMPLOYEE'S SIGNATURE**

7-24-00
**DATE**

Andrew Friedman , News/Talk Content manager
**PRINT Name, market and position (include call letters if applicable)**
[Note to Branch/Station:  Please place signed copy in Branch/Station personnel file.  Do not send copy to Corporate.]

Clear Channel Web Services

Form 4134A

Exhibit E

**From:** HOBBS, GABE [gabehobbs@clearchannel.com]
**Sent:** Friday, March 21, 2008 9:16 PM
**To:** Friedman, Andy
**Subject:** RE: Did you get it?

Hang on.  Will sign on home computer and send again.  Tribune internet wants to talk to you.

Sent from my Motorola Q.

-----Original Message-----
From: "Friedman, Andy" <AndyFriedman@clearchannel.com>
To: "HOBBS, GABE" <gabehobbs@clearchannel.com>
Sent: 3/21/2008 9:32 PM
Subject: RE: Did you get it?

Nada! I got two e mails in my Hotmail saying "did you get it." I'm in suspense now!

From: HOBBS, GABE
Sent: Fri 3/21/2008 5:17 PM
To: Friedman, Andy
Subject: Did you get it?

Sent from my Motorola Q.

**From:**    Friedman, Andy [AndyFriedman@clearchannel.com]
**Sent:**    Thursday, April 03, 2008 1:56 PM
**To:**    Hinrichs, Gloria
**Subject:** RE: Time to catch up....

☺ we'll see what's up

**From:** Hinrichs, Gloria [mailto:GHinrichs@Tribune.com]
**Sent:** Thursday, April 03, 2008 1:54 PM
**To:** Friedman, Andy
**Subject:** RE: Time to catch up....

So, Russ is here.....are you coming?  :)

**From:** Friedman, Andy [mailto:AndyFriedman@clearchannel.com]
**Sent:** Thursday, January 10, 2008 3:14 PM
**To:** Hinrichs, Gloria
**Subject:** RE: Time to catch up....

Hey I just left you a VM.

Great to hear you're at Tribune!

Hope you're well.

**Andy Friedman**
VP, Marketing - News/Talk & Sports

**Clear Channel Online Music & Radio**
222 Northfield Rd. #201
Northfield, IL 60093

E: andyfriedman@clearchannel.com
P: 847-784-7017
C: 847-722-2712
AIM: afriedman847
(847) 784-7017

**From:** Hinrichs, Gloria [mailto:GHinrichs@Tribune.com]
**Sent:** Thursday, January 10, 2008 3:10 PM
**To:** Friedman, Andy
**Subject:** Time to catch up....
**Importance:** High

Hi,

Sorry to have been out of touch for so long.  Spoke with Mr. Martin today and he mentioned you are still

going strong @CC.
Good for you...and probably the smartest thing they have done in a long time.

Let me know how you are...here's my info...and send me your's again.  I had always depended on the CC internal listing for phone numbers...so I was sort of lost when I left.

Hope the family, etc. are all well....

miss you and dominick's!


*gloria*

Gloria Hinrichs
Director, Marketing & Creative Services
Tribune Media Net

(312) 222-7860
ghinrichs@tribune.com

435 N. Michigan Avenue
Chicago, IL 60611



*Los Angeles Times; Chicago Tribune; Newsday (Long Island); South Florida Sun-Sentinel (Ft. Lauderdale); The Sun (Baltimore); Orlando Sentinel; Hartford Courant; The Morning Call (Allentown, PA); Daily Press (Newport News, VA); amNewYork; RedEye (Chicago); Hoy Chicago; Hoy LA; El Sentinel Orlando; El Sentinel Ft.Lauderdale/Miami; Tribune Interactive*

**From:**    Friedman, Andy [AndyFriedman@clearchannel.com]
**Sent:**    Thursday, February 14, 2008 3:01 PM
**To:**    Jodi Carlson
**Subject:** RE: IM

I'm thinking so. And he keeps AIM'ing me

---

**From:** Jodi Carlson [mailto:JodiCarlson@comcast.net]
**Sent:** Thursday, February 14, 2008 3:00 PM
**To:** Friedman, Andy
**Subject:** RE: IM

He's SO in!

---

**From:** Friedman, Andy [mailto:AndyFriedman@clearchannel.com]
**Sent:** Thursday, February 14, 2008 2:44 PM
**To:** jodicarlson@comcast.net
**Subject:** IM

JRGKGB: so you seen this site?
JRGKGB: http://www.thestandard.com/
afriedman847: this is a very interesting concept!
JRGKGB: indeed
JRGKGB: powered by drupal
afriedman847: now - what if that concept was integrated with Tribune news sites - who will win Dem nomination, etc... sponsors kick in prizes etc
JRGKGB: oh yeah
JRGKGB: that's already on the list

**Andy Friedman**
VP, Marketing - News/Talk & Sports

**Clear Channel Online Music & Radio**
222 Northfield Rd. #201
Northfield, IL 60093

E: andyfriedman@clearchannel.com
P: 847-784-7017
C: 847-722-2712
AIM: afriedman847
(847) 784-7017

## RE: WorldNow Provided Content

5/5/2008 6:28:33 PM

**From:** Russ Gilbert [russ@russgilbert.com]
**To:** Friedman, Andy

Find out what it all will cost.  They may see Tribune and think $$$ as opposed to CC who is known for being cheap.

Check these guys out:  www.everyzing.com - they're a company I'm toying with giving a 6 month trial in a few places.

Can AP help with Weather?

> ----- Original Message -----
> **From:** Friedman, Andy
> **To:** Russ Gilbert
> **Sent:** Monday, May 05, 2008 5:29 PM
> **Subject:** RE: WorldNow Provided Content
>
> I'm thinking I'll have to reach out to AP sooner rather than later and talk about a couple things:
>
> - Wire service re-use for TV station sites (this will be free)
> - Deal for AP video. If we want local customization and monitization we should think about purchasing their FTP version of news video. CC quote was like 10-12k per month. They price by unique users and we have fewer so we might get a smokin' deal. If we roll out new sites with superior video product than World Now we'll definately have the field's attention with that. Multi-channel approach would do so even more.
>
> Oh, and we should talk about how we'll pimp out the weather offering.
>
> Thanks

**From:** Russ Gilbert [russ@russgilbert.com]
**Sent:** Monday, May 05, 2008 12:56 PM
**To:** Friedman, Andy
**Subject:** Fw: WorldNow Provided Content

> ----- Original Message -----
> **From:** Isbell, Brad
> **To:** Russ Gilbert
> **Sent:** Monday, May 05, 2008 10:00 AM
> **Subject:** WorldNow Provided Content
>
> Attached is a basic list of content provided by WorldNow.  There may be more in use than on this list.  I will have to check first with the other stations.
>
> **Brad Isbell**
> Internet Content Manager
> WQAD / LocalTV LLC
> (309) 736-3223
> Brad.Isbell@WQAD.com

**RE: Fista $**                                                          5/8/2008 9:30:27 AM
From: Gilbert, Russ [rgilbert@tribune.com]
To: Friedman, Andy

---

Title unimportant.  Call him a wildlife specialist if you want.

Bring him in at that.  We have staff that's too expensive.  sheesh.

---

From: Friedman, Andy [mailto:andyfriedman@localtvllc.com]
Sent: Thu 5/8/2008 9:27 AM
To: Gilbert, Russ
Subject: Fista $

Talked to Alison. She pointed out that Fist will likely be supervising several people who make 20-30k more than him. Paul Muth is in the 90's apparently. Scott Anderson was doing like 138k.

This does not mean we need to throw money away. It likely means there's staff in there now that's too expensive.

It does mean we should not call him a Director, which of course I'd like to do at least eventually.

I'll stick to the 60-65 thing but FYI.

**RE: News/Talk & Spots - Web Traffic Builders**                    5/2/2008 11:30:33 AM

**From:** Friedman, Andy
**To:** Pad970@aol.com

Ya hah! Had dinner w Randy last night. What fun. you GOTTA git up here.

**From:** Pad970@aol.com [Pad970@aol.com]
**Sent:** Friday, May 02, 2008 8:02 AM
**To:** Friedman, Andy
**Subject:** News/Talk & Spots - Web Traffic Builders

So I was really surprised to see this come from YOU this morning in my email.  Are you working out a notice?

Gabe

Wondering what's for Dinner Tonight? Get new twists on family favorites at AOL Food.

## RE: Planning Meetings

5/9/2008 4:11:46 PM

**From:** Jedlinski, Jason [JJedlinski@Tribune.com]
**To:** Friedman, Andy

Absolutely, Andy. In the interest of full disclosure, I did give Paul a heads up that you would likely be talking with him this afternoon about a new resource starting Monday, but that was it. Haven't mentioned a thing to my staff.

Best,
Jason

---

**From:** Friedman, Andy [mailto:andyfriedman@localtvllc.com]
**Sent:** Friday, May 09, 2008 4:08 PM
**To:** Jedlinski, Jason
**Subject:** Planning Meetings

Hey Jason -

Great meeting with you today about the content, what's available, what ideas you have and what we need to be moving forward with.

Your input and advice is invaluable.

Please help me by keeping all conversations confidential.

That will allow us to delve into lots of areas that are delicate, but useful and critical.

Thank you,

af

Exhibit F

**contacts**

5/4/2008 2:44:30 PM

**From:** Andy Friedman [friedman_andy@hotmail.com]
**To:** Friedman, Andy
**Attachments:** Andy's Contacts.pst

Exhibit G

# Local TV

*Wikipedia is sustained by people like you. Please **donate** today.*

From Wikipedia, the free encyclopedia

**Local TV LLC** is a limited liability corporation owned by Oak Hill Capital. The company was created in 2007, after Oak Hill entered into an agreement to purchase the nine television stations owned by The New York Times Company.

Local TV LLC took ownership of the stations, all located in medium- to small-sized markets, at 12:01 a.m. on Monday, May 7, 2007. Randy Michaels, the former chief executive officer of Clear Channel Communications, was originally CEO. Robert Lawrence is President and chief operating officer. On December 20, 2007 Local TV announced that Bobby Lawrence would be CEO.[1]

On December 21, 2007, Tribune Company and Local TV agreed to form an as-yet-unnamed "broadcast management company" to provide management services to both Tribune's and Local TV's stations.[2] Also on December 21, Local TV announced plans to formally acquire eight Fox owned-and-operated stations one day later, on December 22, 2007.[3][4]

| Local TV LLC | |
|---|---|
| Local TV | |
| **Type** | Private |
| **Founded** | 2007 |
| **Headquarters** | Fort Wright, Kentucky, USA |
| **Key people** | Bobby Lawrence, CEO |
| **Industry** | Broadcast television |
| **Parent** | Oak Hill Capital Partners |
| **Website** | www.localtvllc.com (http://www.localtvllc.com/) |

# Contents

- 1 Stations
- 2 Impending Fox purchase
- 3 References
- 4 External links

## Stations

These stations were purchased by Local TV from the New York Times Company on May 7, 2007:

| DMA# | City of license/Market | Station | Channel TV / DT | Owned Since | Affiliation |
|---|---|---|---|---|---|
| 42. | Norfolk - Portsmouth - Newport News | **WTKR** | 3 / 40 | 2007 | **CBS** |
| 45. | Oklahoma City | **KFOR-TV** | 4 / 27 | 2007 | **NBC** |
| | | **KAUT-TV** | 43 / 40 | 2007 | **MyNetworkTV** |
| 47. | Memphis | **WREG-TV** | 3 / 28 | 2007 | CBS |
| 53. | Scranton - Wilkes Barre, PA | **WNEP-TV** | 16 / 49 | 2007 | **ABC** |
| 71. | Des Moines | **WHO-TV** | 13 / 19 | 2007 | NBC |
| 84. | Huntsville, Alabama | **WHNT-TV** | 19 / 59 | 2007 | CBS |
| 96. | Moline, Illinois (Quad Cities) | **WQAD-TV** | 8 / 38 | 2007 | ABC |
| 105. | Fort Smith - Fayetteville, AR | **KFSM-TV** | 5 / 18 | 2007 | CBS |

**Impending Fox purchase**

These eight stations are being purchased from News Corporation subsidiary Fox Television Stations, announced on December 22, 2007 and pending regulatory approval.

| DMA# | City of license/Market | Station | Channel *TV / DT* | Affiliation |
|------|------------------------|---------|-------------------|-------------|
| 17. | Cleveland - Akron | **WJW-TV** | **8 / 31** | Fox |
| 18. | Denver | **KDVR** | **31 / 32** | Fox |
| | Fort Collins, Colorado | **KFCT** *(satellite of KDVR)* | **22 / 21** | Fox |
| 21. | St. Louis | **KTVI** | **2 / 43** | Fox |
| 31. | Kansas City, Missouri | **WDAF-TV** | **4 / 34** | Fox |
| 34. | Milwaukee | **WITI-TV** | **6 / 33** | Fox |
| 35. | Salt Lake City | **KSTU** | **13 / 28** | Fox |
| 40. | Birmingham - Tuscaloosa, AL | **WBRC-TV** | **6 / 50** | Fox |
| 46. | High Point - Greensboro - Winston-Salem, N.C. | **WGHP** | **8 / 35** | Fox |

# References

1. ^ Local TV LLC (http://www.localtvllc.com/pressroom/2007/12/20/local-tv-announces-bobby-lawrence-as-ceo/)
2. ^ Tribune Company (2007-12-20). "Tribune and Local TV to Form Broadcast Management Company (http://www.tribune.com/pressroom/releases/2007/12212007.html)". Press release. Retrieved on 2007-12-21. "Tribune Company and Local TV have entered into a letter of intent to create a third-party broadcast management company which will provide shared services to all of the stations Local TV and Tribune Company own, respectively."
3. ^ News Corporation (2007-12-21). "News Corporation Announces Sale of Eight Television Stations to Oak Hill Capital Partners (http://www.newscorp.com/news/news_360.html)". Press release. Retrieved on 2007-12-22. "News Corporation announced today that it will sell eight of its owned-and-operated Fox network affiliated television stations to Oak Hill Capital Partners for approximately $1.1 billion in cash. The stations include:
   - WJW in Cleveland, OH
   - KDVR in Denver, CO
   - KTVI in St. Louis, MO
   - WDAF in Kansas City, MO
   - WITI in Milwaukee, WI
   - KSTU in Salt Lake City, UT
   - WBRC in Birmingham, AL
   - WGHP in Greensboro, NC
   The sale is subject to regulatory and other customary conditions and is expected to close in the third calendar quarter of 2008."
4. ^ Local TV (2007-12-21). "Oak Hill Capital Partners to Purchase Eight Television Stations From News Corporation (http://www.foxbusiness.com/markets/industries/media/article/oak-hill-capital-partners-purchase-television-stations-news-corporation_418186_15.html)". Press release. Retrieved on 2007-12-22. "We are very pleased to add this outstanding portfolio of Fox affiliated television stations to the Oak Hill portfolio. These stations, like our existing Local TV television stations, have a strong commitment to providing quality news and serving the local community."

# External links

- Local TV LLC (http://www.localtvllc.com/) — official site
- Local TV & Local Responsibility Panel (http://video.google.com/videoplay?
  docid=6266175561619041637) — Part 1 of 3: panel discussion on the takeover of 2 Oklahoma City
  stations by Local TV LLC and its parent company Oak Hill Capital Partners.

Retrieved from "http://en.wikipedia.org/wiki/Local_TV"
Categories: Companies established in 2007 | Kenton County, Kentucky | Television broadcasting companies of
the United States | Companies based in Kentucky

- This page was last modified on 15 May 2008, at 14:51.
- All text is available under the terms of the GNU Free Documentation
  License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation,
  Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.