## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CLEAR CHANNEL BROADCASTING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  08 cv 2884 |
| THE TRIBUNE COMPANY, LOCAL TV LLC and ANDREW FRIEDMAN, | ) ) ) | Judge Joan B. Gottschall |
| | ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) | |

## CLEAR CHANNEL BROADCASTING, INC.'S
## MEMORANDUM IN SUPPORT OF ITS MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Roger Pascal
Linda K. Stevens
Julie Furer Stahr
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL  60606
(312) 258-5500

## INTRODUCTION

Andrew Friedman's ("Friedman") hiring by The Tribune Company or Local TV LLC (together, "Tribune") is a clear breach of his non-compete.   The reason for that non-compete provision is the vast amount of Clear Channel Confidential Information that Friedman possesses. Friedman's hiring by the Tribune imperils this information.   As detailed in the Complaint, the Tribune has solicited and hired away a key Clear Channel executive who cannot fulfill his job duties to the Tribune without making reference in his mind to the confidential information regarding that marketplace to which he had access, and helped to develop, for Clear Channel.

## FACTS AND BACKGROUND

To avoid duplication, Clear Channel adopts and incorporates by reference the facts alleged in its Verified Complaint.

## ARGUMENT

Whether Clear Channel is entitled to a temporary restraining order ("TRO") turns on the following familiar factors: (1) the reasonable likelihood of success on the merits; (2) the irreparable injury absent a TRO; (3) the unavailability of an adequate remedy at law absent a TRO; (4) the balance of benefits and harms to the parties; and (5) the public interest.   *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987), *cert. denied*, 485 U.S. 993 (1988); *Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 661 (N.D. Ill. 1989).   These factors are analyzed using a "sliding scale." *Roland Mach. Corp. v. Dresser Indus., Inc.*, 749 F. 2d 380, 387 (7th Cir. 1984) ("[t]he more likely plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor").

I.    **Clear Channel Has a Reasonable Likelihood of Success**

      A.    **Likelihood of Success  - Breach of Contract Claim Against Friedman**

Friedman's Employment Agreement with Clear Channel (the "Agreement") provides for a term of two years and for renewal from year to year thereafter, with the current term to expire at the end of 2008.  (Complaint, ¶20(a))  The Agreement also contains a non-compete provision stating that Friedman "will not, directly or indirectly, be employed or retained by . . .  any business that distributes audio, video, and/or data content, whether such distribution is in the form of analog, digital, cellular, broadband, streaming, 'high definition' or otherwise, and whether such distribution is received via radio, television, cable, internet, satellite, wireless or otherwise which is receivable in any [area . . . ] in which Employee has responsibilities and duties under this Agreement or within a 50-mile radius . . . ."  (Complaint ¶20(e); Agreement, attached as Exhibit A to the Complaint at §7)  There can be no dispute that Friedman's new position for the Tribune is prohibited by this non-compete provision; indeed Friedman has admitted that he will be Vice President of the Tribune's "Interactive" business and that his duties will be substantially the same as they were for Clear Channel.  (Complaint, ¶12)  Friedman also is breaching his contractual obligation not to hire, solicit or encourage any of his former colleagues to leave Clear Channel.  (Complaint, ¶25)

### 1.    The non-compete is valid and enforceable.

The non-compete contained in Friedman's Agreement is valid and enforceable under Texas law, which applies to the Agreement pursuant to the choice of law provision in Section 12. Under Texas law, the enforceability of a non-compete is a question of law for the court to decide. *See, e.g., Light v. Centel Cellular Co.*, 883 S.W.2d 642, 644 (Tex. 1994), *overruled, in part, on other grounds, Alex Sheshunoff Mgmt. Serv. L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006).  To be enforceable, Texas' Covenants Not to Compete Act (the "Non-compete Act") requires that a non-compete covenant must (1) be ancillary to or part of an otherwise enforceable agreement at

the time the agreement was made and (2) contain limits as to time, geography, and scope of restrained activity that are reasonable and impose no greater restraint than necessary to protect the goodwill or other business interest of the promisee. TEX. BUS.& COM. CODE. § 15.50 (2008). Both requirements are met here.

<h3 style="text-align:center">a.    The non-compete is ancillary to an otherwise enforceable agreement.</h3>

Under the Non-compete Act, an "otherwise enforceable agreement" is one where each party makes at least one binding, non-illusory promise to the other. *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003); *Anderson Chem., Inc. v. Green*, 66 S.W.3d 434, 438 (Tex. App.-Amarillo 2001, no writ). One of the exchanged promises may be fulfilled at a future date. *Alex Sheshunoff Mgmt. Serv.*, 209 S.W.3d at 655 (an executory promise, e.g., an employer's promise to provide confidential information to employee in the future, may function as one side of the bilateral exchange of promises needed to support a non-compete).

Here, there are two such "otherwise enforceable agreements": (i) the non-disclosure provision of the Agreement and (ii) the agreement to employ, and to be employed, for a specific term. *See, e.g., Guy Carpenter*, 334 F.3d at 465; *Pearson v. Visual Innovations Co., Inc.*, No. 03-04-00563-CV, 2006 WL 903736, *4 n.6 (Tex. App.-Austin Apr. 6, 2006, no writ) (noting the case law establishing that "a covenant not to compete is supported by non-illusory promises to provide confidential and proprietary information and/or specialized training in exchange for an employee's promise not to compete or disclose the information"); *CRC-Evans Pipeline Int'l Inc. v. Myers*, 927 S.W.2d 259, 265 (Tex. App.-Houston [1st Dist.] 1996, no writ) (same); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 230 (Tex. App.-Texarkana 1998, no pet. h) (finding an "otherwise enforceable agreement" where agreement provided for a term of years); *Beasely v. Hub City Texas, LP*, No. 01-03-00287-CV, 2003 WL 22254692 (Tex. App.-Houston

[1st Dist] Sept. 29, 2003) (employment contract for term of years supports a non-compete agreement).

In addition to an "otherwise enforceable agreement," Texas law requires that the non-compete must be "ancillary" to that otherwise enforceable agreement. Ancillarity is defined as follows: "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement." *Light*, 883 S.W.2d at 647; *Evan's World Travel*, 978 S.W.2d at 230.

Texas courts have held that non-disclosure agreements are ancillary to non-compete agreements because they include a promise to provide the confidential information that a non-compete will protect. *See, e.g., Light,* 883 S.W.2d at 647; *Pearson,* 2006 WL 903736 at *4; *Beasley*, 2003 WL 22254692 at *5. Moreover, in this case, the explicit language of Friedman's Agreement establishes ancillarity when it (i) states that its purpose is "[t]o preserve the Company's Confidential Information" (*See* Agreement, §7) and when it obligates Clear Channel to provide Confidential Information, stating it "has or will provide Employee with access." *See Beasley*, 2003 WL 22254692 at *5; *Evan's World Travel*, 978 S.W.2d at 230-31 (non-compete met the "ancillary to" requirement when employment agreement gave an employee access to confidential information).

###   b.    The non-compete limitations as to time, geography, and scope of restrained activity are reasonable.

The temporal scope of Friedman's non-compete extends through the end of Friedman's severance period, or December 31, 2008. (Complaint ¶29) This brief period (approximately 7 months) is reasonable. *See Guy Carpenter*, 334 F.2d at 462 (one-year covenant barring former

vice president of brokerage from soliciting customers was reasonable); *Alex Sheshunoff Mgmt. Serv.*, 209 S.W.3d at 657 (one-year prohibition against providing consulting services to employer's clients and two-year prohibition against selling competing products deemed reasonable); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.-Houston [1st Dist.] 2001 , no pet.) (2-year non-compete barring operations manager from competing in two-county area where he had worked was reasonable); *Evan's World Travel*, 978 S.W.2d at 230 (3-year non-compete barring travel agent from competing in the county where she had worked was reasonable). Friedman's seven-month restriction is especially reasonable in light of the fact that Clear Channel will continue paying Friedman his salary as severance during the period that he foregoes competition.[1] Geographically, the non-compete is limited to the specific areas as to which Friedman performed duties for Clear Channel, and so is also reasonable under the Non-compete Act. *See, e.g., Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114, 119 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (restriction as to the U.S. and Canada is reasonable where employee had worked in those areas).

The scope of prohibited activity in this case is also reasonable. Where an employee's duties are such that he or she has significant access to an employer's confidential and propriety information, Texas courts have ruled that it is reasonable to bar them from employment with competitors for a reasonable time. For example, the non-compete in *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 902 (Tex. Civ. App.-Houston 1978, writ ref'd n.r.e) barred a former company Vice President from working for one year in any capacity for a competing

---

[1] Obviously, if Friedman continues to breach his covenant not to compete, it would be necessary and appropriate to toll the time period of the covenant for so long as he in breach of it, in order to give Clear Channel the benefit of the bargain it struck with Friedman. *Guy Carpenter*, 334 F.3d at 464 (court may extend non-compete period beyond the expiration date because "injunctions are equitable in nature"); *Premier Indus. Corp. v. Tex. Indus. Fastener Co.*, 450 F.2d 444, 448 (5th Cir. 1971) ("[the] argument that the trial judge exceeded his discretion by enjoining the appellants beyond the time specified in the ... contract is without merit"). This is particularly true where the time period is very brief, as is the case here.

manufacturer. There, the court noted that the former executive "was fully informed as to [the Employer's] new product development, layout and design" for its product lines. *See id.* at 901. The executive had been hired by the competitor after it purchased a portion of the employer's line of business. The court reasoned that "[e]ven in the best of good faith, [the employee] can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work . . . . [and] the only effective relief for [the employer] is to restrain [the employee] from working for [a competitor] in any capacity related to the manufacture [of the employer's product line]." *See id.* at 902. Noting that employee had only been barred from working in a particular line of business, the court held that the restraint was reasonable. *See also Curtis,* 12 S.W.3d at 119 (former Vice President hired by the competition to head up and develop a competing business; non-compete preventing him from working for any competitor in North America was reasonable.)

Like the employees in *Weed Eater, Inc.* and *Curtis*, Friedman is a former Vice President with extensive involvement in, and confidential knowledge about, the particular area of business for which he was responsible in his former employment. Now, Friedman seeks to perform substantially the same duties, in the very same area of business, for the Tribune.

### 2.    Reformation

Even if this Court were to find the non-compete provision to be overly broad, Clear Channel would be entitled to reformation of that provision, in accordance with both the language of the non-compete provision (see §7b) and the Non-compete Act, which provides that where a non-compete "is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or business

interest of the promisee, *the court shall reform the covenant* to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and to enforce the covenant as reformed." TEX. BUS. & COM. CODE 15.51(c) (emphasis added).   Accordingly, reformation of overbroad restriction is mandatory once the "otherwise enforceable agreement" and "ancillary to" requirements have been met. *See, e.g., Evan's World Travel*, 978 S.W.2d at 233 ("Since we find that the covenant in this case is ancillary to an otherwise enforceable agreement, but imposes an unreasonable geographical restriction, we are commanded by law to reform the covenant"). Friedman's Agreement also expressly provides for such reformation.  (Exh. A to the Complaint, ¶7(b))

**B.      Likelihood of Success -- Clear Channel's Trade Secrets Claims**

Clear Channel is also likely to succeed on the merits of its claims against the Tribune and Friedman for trade secret misappropriation under Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (the "Act").

**1.      <u>Clear Channel's Confidential Information Constitutes "Trade Secrets"</u>**

The Act gives a broad list of information that can qualify as a trade secret. Specifically, any "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or a list of actual or potential customers or suppliers," can be a trade secret, so long as the information satisfies two criteria: (1) it is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure and use; and (2) is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy or confidentiality. 765 ILCS 1065/2(d).   The list of Clear Channel

Confidential Information to which Friedman had access (Complaint, ¶14) falls squarely within

the Act's broad list of information that may be protected.[2]   Moreover, the Confidential

Information also satisfies both the trade secrets criteria.

As detailed in the Verified Complaint, Clear Channel has become a leader in the

Online/Interactive Business, in large measure due to its use of the Confidential Information. The

value of this type of information to a competitor is obvious, and that value would dramatically

diminish if the information were disclosed and could be used by Clear Channel's competitors.

The main reason this information is valuable, therefore, is because it is sufficiently secret not to

be generally known to Clear Channel's competitors, such as the Tribune, who would greatly

benefit from knowing it. The competitive value of information of this information does not arise

only from the possibility that it will be used by a competitor as its own. Even if the Tribune

could credibly claim that it has no interest in copying or using Clear Channel's strategies, the

real value in possessing the opposing team's playbook is not to copy it, but learn what counter-

strategies would be most effective.

Clear Channel also satisfies the second requirement for the existence of a trade secret: the

use of reasonable efforts to maintain secrecy.  The information for which Clear Channel now

---

[2] *See, e.g., PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (non-public information about an employer's pricing, pricing strategies, distribution strategies, and marketing strategies constituted a trade secrets worthy of protection under the ITSA); *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (trade secret protection given to marketing strategies, financial performance and projections where they would allow competitor unfair advantage and cut the time and costs to develop a new product); *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 865-866 and 875 (N.D. Ill. 2001) (customer information protected as trade secret accumulated over years with a cost of several million dollars); *Labor Ready, Inc. v. Williams Staffing*, LLC, 149 F. Supp.2d 398, 412 (N.D. Ill. 2001) (personnel files and information deemed trade secrets); *The Agency, Inc. v. Grove*, 839 N.E.2d 606, 615-16 (Ill. App. Ct. 2005) (customer information deemed trade secret); *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995) (same).

seeks protection was made available to only a limited number people within Clear Channel's organization. *See, e.g., Service Ctrs. of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1136 (Ill. App. Ct. 1989) (disclosure to only those who need to know content of trade secret is adequate protection under the Trade Secrets Act). Moreover, those employees with access to Clear Channel's confidential information – including Friedman – signed agreements to keep that information confidential. *See, e.g., RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001); *Mangren Research and Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 943 (7th Cir. 1996); *Affiliated Hosp. Prods., Inc. v. Baldwin*, 373 N.E.2d 1000, 1006 (Ill. App. Ct. 1978) (signed confidentiality agreement put employee on notice that documents were confidential even though not so marked). Clear Channel also has adopted and provided to employees such as Friedman clear and explicit confidentiality policies and has required those employees to sign acknowledgements that they have received and understood those policies. (Complaint, ¶16) Finally, Clear Channel has taken additional steps to protect its premises and its electronic databases and the Confidential Information stored there. (Complaint ¶16) These measures are more than reasonable. *See, e.g., RKI*, Inc., 177 F. Supp. 2d at 874.

### 2. The Defendants' Misappropriation of Clear Channel's Trade Secrets Is both Threatened and Inevitable.

Under the Act, "[a]ctual or threatened misappropriation of trade secrets may be enjoined." 765 ILCS 1065/3(a). *See also George S. May Int'l Co. v. Int'l Profit Assoc.*, 628 N.E.2d 647, 653 (Ill. App. Ct. 1993). Under the Act, misappropriation may occur through:

(1) the acquisition of a trade secret by one who knows or has reason to know that the trade secret was acquired by improper means (such as breaching an obligation of confidence or other duty to maintain secrecy). 765 ILCS 1065/2(a)-(b)(1).

(2) the disclosure or use of a trade secret by one who used improper means to acquire knowledge of the trade secret. 765 ILCS 1065/2(b)(2)(A).

(3) the disclosure or use of a trade secret by one who, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. 765 ILCS 1065/2(b)(2)(B)(I)-(II).

(4) the disclosure or use of a trade secret by one who, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was derived from or through a person who owed a duty to the person seeking relief [here, Clear Channel] to maintain its secrecy. 765 ILCS 1065/2(b)(2)(B)(I)-(III).

Friedman's disclosure of Clear Channel's trade secrets to the Tribune, and Defendants' use of those trade secrets for their own benefit, are acts of misappropriation under any of these definitions, because Friedman learned the information as a result of − and his use or disclosure of that information would be a breach of − contractual and fiduciary duties of confidentiality.

The preliminary stages of analysis of Friedman's computer (which analysis is not yet completed) has revealed several instances of misappropriation, including emails in which he transmitted and disclosed Clear Channel Confidential information to the Tribune. (Complaint ¶¶25-26) Moreover, vast amounts of files and data – some apparently relating to Clear Channel and some apparently relating to his work for the Tribune – appear to have been deleted from Friedman's Clear Channel computer the day following his departure, just hours before turning that computer over. (Complaint ¶¶32-34)

Friedman's conduct gives no reason to believe that the misappropriation of Clear Channel's Confidential Information will stop absent injunctive relief. His blatant breaches of fiduciary duty, his caution to Tribune colleagues to keep their conversations confidential, and his repeated disregard for the confidentiality of Clear Channel's information demonstrate that he cannot be trusted to self-police his guardianship of that information.

Even if Friedman could claim to be acting with honest intentions (which his conduct clearly indicates he is not) continued and future misappropriation would be not only

"threatened," but inevitable.  As alleged in the Complaint, Friedman was responsible for the creation and marketing of Clear Channel's online and interactive venues, which will be directly competitive with the online and interactive venues Friedman will be helping to conceive, develop, and implement for the Tribune.  Friedman himself has admitted that his new job for the Tribune will be "a mixture of his two Clear Channel positions."  (Complaint, ¶12)

Two final points make this case particularly appropriate for injunctive relief to protect Clear Channel's trade secrets:  (1) this is not a case where entering an injunction pursuant to the inevitable disclosure doctrine would supply a non-compete where the parties did not sign one – in this case Friedman did sign a non-compete, but is breaching it, and (2) Clear Channel is willing to pay Friedman his salary while he foregoes competition.

In much less compelling circumstances, courts have enjoined the employment of someone possessing the trade secrets of his former employer who proposes to undertake similar duties for the competition, recognizing that misappropriation is "inevitable" in such situations. *See Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166, 1170 (Ill. App. Ct. 2000); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995); *Am. Totalisator Co. v. Autotote Ltd.*, 1983 WL 21374, *5 (Del. Ch. 1983); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982); *Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 530 A.2d 31, 31 (N.J. Super. 1987); *Allis-Chalmers Mfg. Co. v. Cont'l Aviation & Eng'g Corp.*, 255 F. Supp. 645, 654 (E.D. Mich. 1966); *Fountain v. Hudson Cush-N-Foam Corp.*, 122 So.2d 232, 234 (Fla. Dist. Ct. App. 1960).

The new employer, too, may be enjoined from employing its competitor's former employee who possess the competitors' trade secrets, or held liable for misappropriation of the competitor's trade secrets if they do employ such an employee, in circumstance such as there. *See PRG-Schultz Int'l, Inc. v. Kirix Corp.*, 2003 WL 22232771, *7 (N.D. Ill. 2003) (where

company hires employee from competitor and then places him in a position where the competitor's trade secrets must inevitably be disclosed or used, that employer may be held liable for misappropriation of the trade secrets); *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 925 (N.D. Ill. 2002); *C&F Packing, Inc. v. IBP, Inc.*, 1998 WL 1147139, *7 (N.D. Ill. 1998) (citing *PepsiCo*, 54 F.3d at 1269; *PepsiCo, Inc. v. Redmond*, No. 94-C-6838, 1996 WL 3965, at *17 (N.D. Ill. Jan. 2, 1996))

Such relief is needed here. If Friedman is permitted to work for the Tribune in the very same market and industry for which he was responsible at Clear Channel, he simply could not do so in a vacuum. As stated by the court in *PRG-Schultz Int'l*, "unless an employee possesses 'an uncanny ability to compartmentalize information, he will necessarily' by relying on and using his former employer's trade secrets" when he is called upon to fulfill a similar role for the new employer. 2003 WL 22232771 at *7. Similarly, if Friedman is allowed to work for the Tribune – in a position that he has admitted involves the same duties he performed for Clear Channel – conceiving, developing and marketing content, programming, and features for the Tribune's online/interactive offerings, he will do so with full knowledge of the details regarding Clear Channel's Online/Interactive Business. It will be impossible for Friedman to avoid making reference in his mind to Clear Channel's information, and Defendants will get an unfair windfall, to the great and irreparable competitive disadvantage of Clear Channel.

### C.    Likelihood of Success -- Tortious Interference Claim Against the Tribune.

To succeed on its tortious interference claim against the Tribune, Clear Channel must show: (1) a valid and enforceable contract; (2) defendant's knowledge of that contract; (3) defendant's intentional and malicious inducement of a breach of that contract; (4) actual breach of the contract by a third party, caused by the defendant's wrongful conduct; and (5) damages to

the plaintiff as a result of the breach. *See, e.g., Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1273 (7th Cir. 1993).

The Tribune knew that Friedman was employed by Clear Channel when it recruited him. Such knowledge is sufficient to satisfy the second element of a claim for tortious interference with contract. *See Fine Line Distrib., Inc. v. Rymer Meats, Inc.*, 1994 WL 282299, *3 (N.D. Ill. 1994) (even knowledge of an at-will relationship between employer and employee sufficient to satisfy this element of the claim). Despite this knowledge, the evidence reveals that the Tribune intentionally and maliciously sought to cause Friedman to breach his employment agreement with Clear Channel, including the non-compete agreement. Indeed, Friedman appears to have been engaging in competitive analysis and strategizing for the Tribune well before he left Clear Channel's employment. (*See* Complaint ¶¶24-26) Such conduct constitutes tortious interference with the Agreement. *Europlast*, at 1275 (employee working to improve a competitor establishes that competitor interfered with employee's contract with employer); *Fine Line*, 1994 WL 282299 at *3 (encouraging employee to set up business that competed with his then-current employer sufficient allegation to show inducement to breach); *RKI*, 200 F. Supp. 2d at 924 (new employer's knowledge of employment agreement and its offer to employ him at a higher salary to compete former employer actionable).

**II.    Absent Injunctive Relief, Clear Channel Will Suffer Irreparable Harm and Will Lack an Adequate Remedy at Law.**

Protection of Clear Channel's trade secrets is the very reason for the non-compete at issue. Breach of that agreement, and the resulting threat to Clear Channel's trade secrets constitutes "irreparable harm," as a matter of law. As the court recognized in *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. 1996), *aff'd*, 54 F.3d 1262 (7th Cir. 1995), "where trade secrets and confidential information are at issue, as they are here, irreparable harm flows

necessarily from the actual or threatened loss of the important protectible [sic] business interests at stake." *See also Refractory Tech., Inc. v. Koski*, No. 90-C-4350, 1990 WL 119560, at *3 (N.D. Ill. Aug. 13, 1990); *CPG Prods. Corp. v. Mego Corp.*, 214 U.S.P.Q. 206, 214 (S.D. Ohio 1981); *IDS Life Ins. Co., v. SunAmerica, Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997) (irreparable harm is "inherent" in trade secret and non-compete cases), *vacated, in part, on other grounds*, 136 F.3d 537 (7th. Cir.  1998)

The imminence of this irreparable injury is the reason Clear Channel seeks injunctive relief against Friedman pending arbitration of its claims against him.   The employment agreement between Clear Channel and Friedman contains an arbitration clause, and Clear Channel is initiating an arbitration before the American Arbitration Association to address the merits of its claims against Friedman.  During the time it will take to choose an arbitrator and get the issues before him or her, Clear Channel will suffer the very irreparable harm described in the case law cited above.

Even when a dispute is subject to mandatory arbitration, federal courts retain the power to issue injunctive relief in those disputes.   *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 213-14 (7th Cir. 1993) (identifying federal cases holding that a grant of injunctive relief in an arbitrable dispute is proper); *see  also Gateway E. Ry. Co. v. Terminal R.R. Ass'n. of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994) (affirming holding in *Merrill Lynch*).  The strong public policy favoring arbitration is furthered by permitting federal courts to issue injunctive relief to preserve the status quo, and therefore preserve the meaningfulness of arbitration. *Merrill Lynch*, 999 F.2d at 214.

**III.    The Balance of Harms Weighs in Favor of Clear Channel.**

Even aside from a strong likelihood of success on the merits, in this case the balance of harms strongly favors Clear Channel. As discussed above, the harm to Clear Channel in the absence of injunctive relief would be great and irreparable. In contrast, the Tribune has done without Friedman and presumably could continue to do so if the requested TRO is granted. Friedman will continue to receive his salary from Clear Channel while he foregoes competition, and if the TRO is granted, he will remain free to work for any company, anywhere, relating to any type of business, so long as he does not participate in the creation, programming and/or distribution of news, entertainment, or informational content for delivery via "internet protocol (IP)" (whether through the internet or wireless transmission) to computers, cell phones or other handheld electronic devices in the United States.

**IV.    The Public Interest Will Be Served by Injunctive Relief for Clear Channel.**

Illinois courts have found it imperative "to recognize a protectible [sic] business interest where a trade secret exists and . . . a breach of confidentiality by an employee has occurred in the course of his employment." *Burt Dickens & Co. v. Bodi*, 494 N.E.2d 817, 819 (Ill. App. Ct. 1986); *Televation Telecom. Sys., Inc. v. Saindon*, 522 N.E.2d 1359, 1362 (Ill.App.1998). Moreover, "the court should protect the employer's investment of time, money and manpower in developing secret advantages from misappropriation by former employees who occupied a position of trust." *Id.*; *Service Ctrs. Of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1135 (Ill. App. Ct. 1989).

**CONCLUSION**

For the foregoing reasons, Plaintiff Clear Channel Broadcasting, Inc. respectfully requests that this Court enter the Temporary Restraining Order attached hereto and grant it all other relief that the Court deems just and appropriate.

Dated:  May 19, 2008

/s/ Roger Pascal
Roger Pascal
Linda K. Stevens
Julie Furer Stahr
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL  6060
(312) 258-5500

*Attorneys for Plaintiff*
*Clear Channel Broadcasting, Inc.*

CHI\5735772.8